IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 29, 2018 Session

## IN RE APEX R.

**Appeal from the Circuit Court for Knox County**
**No. 1-401-16      Kristi M. Davis, Judge**

_____

## No. E2017-02230-COA-R3-PT

_____

This appeal arises from the termination of a father's parental rights. John C. and Kellee C. ("Petitioners"), uncle and aunt respectively of Apex R. ("the Child"), filed a petition in the Circuit Court for Knox County ("the Trial Court") seeking to terminate Dustin R. ("Father")'s parental rights to the Child. After a trial, the Trial Court entered an order terminating Father's parental rights on the grounds of willful failure to visit and support. The Trial Court found also that termination of Father's parental rights is in the Child's best interest, all by clear and convincing evidence. Father appeals, arguing among other things that the Trial Court lacked subject matter jurisdiction to decide the case under the Uniform Child Custody Jurisdiction and Enforcement Act ("the UCCJEA") because the Juvenile Court for Jefferson County, Alabama ("the Alabama Court") made the initial custody determination, the Child's mother remained in Alabama, and the Alabama Court never relinquished its exclusive and continuing jurisdiction. We hold that the Trial Court had subject matter jurisdiction to adjudicate the termination petition. We hold further that grounds for termination were proven by clear and convincing evidence and that termination of Father's parental rights is in the Child's best interest. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and BRANDON O. GIBSON, JJ., joined.

Shelley S. Breeding and Stephanie L. Prager, Knoxville, Tennessee, for the appellant, Dustin R.

N. David Roberts, Jr., Knoxville, Tennessee, for the appellees, John C. and Kellee C.

# OPINION

## Background

The Child was born out of wedlock to Father and Laura C. ("Mother") in Florida in October of 2014. Father was identified as the Child's father on his birth certificate. Father and Mother never married. Indeed, Mother was married to someone else at the time of the Child's birth. Mother had driven to Florida a few days before the Child was born because Father had insisted Mother come to Florida for the birth of the Child. Mother and Father lived with the Child in Florida for several weeks. Mother later took the Child with her to live in Alabama.

In March 2015, Father filed a complaint for paternity and child support in the Alabama Court. Father also filed a petition for dependency and custody. In April 2015, the Alabama Department of Human Resources ("DHR") filed a petition for dependency regarding Mother. The Child was placed in temporary custody. Various issues cropped up in effecting service upon Mother for her court appearances. While this was underway, Father moved from Florida to Alabama to be closer to the proceedings. Father eventually returned to Florida. In May 2015, the Alabama Court awarded physical custody of the Child to Petitioners, who live in Tennessee. Mother and Father were granted supervised visitation. DHR filed a petition for child support against Mother. In March 2016, upon DHR's motion, the case was closed. Legal custody of the Child was awarded to Petitioners. An order stemming from the March 3 proceedings featured a handwritten statement: "DHR's motion to close is granted, over [Father's] objection. Custody of [the Child] is hereby placed with [Petitioners] per approved ICPC."[1] Another order states: "[Father] is not the legal father. Petition is hereby dismissed."

Father and Petitioners maintained a deeply antagonistic relationship throughout, blame for which is disputed. In August 2016, Petitioners filed a petition in the Trial Court seeking termination of Father's parental rights. In October 2016, Petitioners filed an amended petition. Along with the amended petition, Mother submitted an oath consenting to adoption and surrender of her parental rights. Father filed a response in August 2017. In September 2017, DNA confirmation that Father was indeed the Child's biological father was submitted to the Trial Court. This matter was tried in October 2017. The evidence at trial focused chiefly on Father's failure to visit or support the Child, and his explanations for this failure. Father testified to his efforts:

> Q. Well, let me ask you this: You claim you want to establish a relationship with your child, and we set up visits and you don't have them, we set up

---

[1] Interstate Compact on the Placement of Children ("ICPC").

visits and you cancel them, and then you get mad and you call my client a piece of shit. And then how are you supposed to develop a relationship with your child with that kind of behavior?

A. I was upset and frustrated at the time, sir.

Q. How were you supposed to set up a relationship with that kind of behavior?

A. How about the resistance I was getting from [Petitioners] as well?

Q. What resistance was there to the Father's Day?

A. (Pausing.)

Q. What resistance was there to the next visit that you cancelled?

A. Okay, you want these --

Q. What resistance was there --

A. These are text messages, you don't know. There was also follow-up conversations that --

\*\*\*

Q. Alright. Suffice it to say there were no more visits that were tried to be planned after October the 15th by mutual agreement; you agree with that?

A. No, sir.

Q. Alright. They had given you their address on two different occasions. After this last attempted visit on October the 14th of 2015, let me ask you this: What did you do to try to schedule any further visits?

A. I sent text messages on multiple occasions; every holiday, my birthday, Valentine's Day, Christmas, Thanksgiving, my grandmother's birthday --

Q. Over what period of time?

A. Over a year.

\*\*\*

Q. Alright, so your testimony is, the only thing you did was send texts, and that you thought they were just ignoring you for eight months?

A. Yes.

Q. You didn't write any letters --

A. No.

Q. -- to the post office box they gave you; is that correct?

A. That's correct.

Q. You didn't file anything in court asking to be granted visitation in Tennessee with the child; is that correct?

A. That's correct.

Q. Okay, alright. So after the depositions, you sent, for the first time ever, $250 to Mrs. [C.]; is that right?

A. It is. As soon as they mailed me the paperwork that stated that I was the biological father.

Q. So, is it your position that you would've not paid child support without the DNA testing?

A. If it's not my son why would I pay for him?

Q. Well, I mean, because previously, as we saw in your message to them, you said, "Can I have your address to send some money to help with my child?" You were going to do that?

A. Yeah, I was going to as well.

Q. And you didn't?

A. That's correct.

Continuing his testimony, Father testified regarding child support:

Q. So prior to the petition to terminate, you hadn't sent a penny, had you?

A. No, ma'am.

Q. Not a birthday card, not a Christmas card, not a stuffed animal for Christmas. You have not sent one red anything before the petition to terminate was filed, had you?

A. That's correct.

Q. And then, even after the petition to terminate was filed, you did not send anything until a year in, you've asked for DNA testing; is that correct?

A. Um-hum. (Moving head up and down.) I wanted 100% proof that he's my boy.

Father testified also as to his improved financial situation, and why at one point in the case he moved to Alabama:

Q. Alright. Okay, so because of the death of your father and now the death of your brother, you're saying that you came into a significant amount of money?

A. Yeah.

Q. My recollection in the deposition was you said that was about $675,000?

A. Well, in stock.

Q. In stock in a company?

A. Correct.

-4-

***

Q. You said that your income changed, according to your affidavit, July 1, 2017. So since July 1, 2017 up through today, you've had at least $6,300 a month in income; is that right?
A. Give or take. I mean, I've taken a lot of time off, too, to be traveling, so I haven't had another $2,000 from my job. We can deduct that as well because I've been traveling back forth to here.

***

Q. When you moved to Alabama, the change of address forms we looked at, was there a period of time that you were going back and forth between Florida and Alabama?
A. Yes, multiple times.
Q. And eventually, you moved to Alabama, did you live with your mother?
A. I did, yes.
Q. Why did you move to Alabama?
A. I moved to Alabama because I exhausted all of my funds. I had flown up to file and I had to fly back. And because she was married, I didn't have a birth certificate, so I had to fly back down to Vital Statistics, flew back up, filed again. And at that point, I had nothing left. And I [had] no choice, it was more economic for me to be in Alabama to be going to the Jefferson Courthouse every other week.
Q. You moved to Alabama because of the court proceedings there; is that correct?
A. Yes, yes.

Mrs. C., a Petitioner and the Child's aunt, testified as to her perspective on communications with Father:

Q. Based on what happened with the texts that were sent to you, what did you do?
A. I ended up blocking him from my cellphone.
Q. Did you block him from anything other than your cellphone?
A. Not -- I blocked him from Facebook but not Facebook Messenger.
Q. And why did you do that?
A. Because I was tired of receiving just the irate texts, and the profanity of the messages that were sent.
Q. Were the messages abusive to you?

-5-

A. I felt like they were.
Q. Was the reason that you blocked your phone number and the Facebook page in order to interfere with his visitation?
A. No.

***

Q. What led you to decide to pursue adoption of the child?
A. After having [the Child] for a year and-a-half, I mean, we fell in love with him. I mean, he's, we just melt over him. And we decided that we haven't seen any, um, we haven't heard from or had any interaction anymore with [Father]. So, we, I called you and asked you how to go about getting him adopted.
Q. Alright. Describe the relationship that you and this child have.
A. It's definitely a mother/son relationship. He knows us as his parents, um --
Q. What does he call you?
A. Mommy.
Q. And what does he call your husband?
A. Daddy.

When pressed on communication and cooperation with Father, Mrs. C. testified:

Q. But you couldn't drive an extra twenty minutes for him to see his father; correct? You were unwilling to do that?
A. It's not that I was unwilling, I didn't want to meet at the Aquarium. And he was getting irate. I think I was bending over backwards to even drive to meet him, the mother came all the way to Knoxville.

Mrs. C. testified that her sister, Mother, "lives in Birmingham, or the outskirts." Mrs. C. states that the Child believes Mother is his aunt.

In November 2017, the Trial Court entered an order terminating Father's parental rights to the Child. The Trial Court found that the grounds of willful failure to visit and willful failure to support were proven by clear and convincing evidence. The Trial Court also found by clear and convincing evidence that termination of Father's parental rights is in the Child's best interest. The Trial Court found, in part, as follows:

The minor child was born in Florida to co-petitioner [Mother] on October 13, 2014. [Mother] was married to but estranged from her husband, co-petitioner, Teddy M. [Mother] was romantically involved with

Respondent [Father], and he is listed as the father on the child's birth certificate. Petitioners John C. and Kellee C. are the maternal uncle and aunt of the child, Kellee being [Mother's] sister.

## [The Alabama Proceedings]

***

[Mother] and the child stayed with [Father] in Florida for a few weeks after the child's birth. At some point, [Mother] left with the child. According to [Father], he was not certain where [Mother] went, although he was aware of her living with friends for a period of time and also with [Father's] mother in Alabama for a period of time. According to [Father], [Mother] had a substance abuse problem. On March 2, 2015, [Father] filed a complaint for paternity and child support in Jefferson County, Alabama, alleging that "mother is an endangerment." That case bears docket number CS-2015-87. On April 6, [Father] filed a Petition in the same court, alleging that [Mother] "has a history of drug use, and I found syringes in purse with blood on 3.24.15 when she was at my grandfather's house. I also found (3) — (4) other types of pills in her purse and took pictures. Multiple felon in AL/TN/FL for drugs. I am seeking custody of my son." That case bears docket number JU2015-652.01.

On April 9, 2015, the Alabama Department of Human Resources ("DHR"), filed a Dependent Petition, alleging that the child was dependent and had been placed in protective custody due to mother being arrested on drug-related charges. That case bears docket number JU2015-652.02. On April 10, 2015, a hearing was held, and legal custody of the child was vested in the DHR. On April 22, 2015, [Petitioners] filed a Dependency Petition, docket number JU2015-652.03, seeking custody of the child.

An initial hearing took place on April 24, 2015 in cases JU2015-652.01, .02, and .03. All parties were present, except Teddy M. The Court's Order reflects that [Mother] stipulated to a general need for services. The Order provides that custody of the child remained vested with the DHR and allowed [Mother] to have supervised visitation of the child. A second hearing took place on May 15, 2015. Again, all parties were present, and [Father] was represented by counsel at this hearing. No transcript of the hearing has been provided, but the Court's Order reflects that physical custody of the child was vested with the [Petitioners]. [Mother] and [Father] were allowed supervised visitation "as agreed to and arranged by the parties."

Regarding [Father's] petition in case number CS-2015-87, a hearing was scheduled for July 20, 2015. [Father] appeared, but [Mother] had not yet been served in that case. Accordingly, the case was re-set to August 6, 2015. This Court was not provided with any documentation regarding what, if anything, occurred on August 6, 2015. Subsequently, the State of Alabama filed its own petition for support against [Mother] on September 25, 2015. That case bears docket number CS-2015-901135.00.

To summarize the pleadings, three dependency petitions were pending-one filed by [Father] (JU2015-652.01), one filed by the Alabama DHR (JU2015-652.02), and one filed by [Petitioners]. (JU2015-652.03). Two support petitions were pending-one filed by [Father] (CS-2015-87), and one filed by the State of Alabama (CS-2015-9011135.00).

In the dependency cases, another hearing took place on October 22, 2015. Again, all parties were present.[2] At this hearing, the Court maintained physical custody of the child with [Petitioners] and legal custody with the DHR. The Order references [Father's] support petition, CS2015-87. The Order further provides [Mother], but not [Father], with supervised visitation of the child.

No activity occurred in either set of proceedings until February 22, 2016, when the DHR filed a motion to close dependency cases JU2015-652.02 and .03. In the two support cases, [Father's] lawyer filed a motion to consolidate the cases. On March 2, 2016, [Father's] lawyer filed a motion to continue the dependency cases in light of the pending support cases. The motion asserts that [Mother] was just served in case number CS-2015-87 on February 27, 2016.

A hearing was held on March 3, 2016. The Order reflects that the Court granted the DHR's motion to close cases 652.02 and .03 over [Father's] objection, denied his motion to continue, and dismissed his dependency petition (652.01) because he was not the legal father of the child. The Order so reflecting was filed on March 9, 2016. No appeal from this Order was filed by [Father]. This Court has not been provided with evidence of any further activity on [Father's] Alabama support case (CS-2015-87). [Petitioners] filed the present Petition to adopt the child and terminate parental rights on August 30, 2016.

**[Willful Failure to Visit and Willful Failure to Support]**

\*\*\*

---

[2] It is unclear why [Father] did not have [Mother] served at this hearing with his petition in case number CS-2015-87.

The Court will first address the allegation of abandonment by willful failure to visit. The relevant time period is April 29 through August 30, 2016. It is undisputed that [Father] did not visit the child during that time period. [Father] contends, however, that his failure to visit was not willful because the conduct of [Petitioners] thwarted his visitation, both early in the proceedings when he claims they would not work with him on scheduling visitation, and later when, unbeknownst to him, Kellee blocked his text messages. [Father] relies primarily upon the case of *In re Lyric J.*, 2014 WL 7182075 (Tenn. Ct. App. Dec. 16, 2014). In that case, the Court of Appeals reversed the Trial Court's finding of willful failure to visit. The Court of Appeals noted that the father, who lived in another state, had called the child's grandmother, who had physical custody of the child, once per month to set up visitation; however, the grandmother always told the father that visitation was not a good idea at the time. In addition, the grandmother testified that she was afraid to let the father visit the child because she feared the father would take the child. The Court of Appeals held that a parent who has tried to visit his or her child but has been "'thwarted by the acts of others and circumstances **beyond his [or her] control'** has not willfully failed to visit." Id. at *5 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d 798, 810 (Tenn. 2007) (emphasis added)). The Court determined that a parent's failure to visit may be excused by a third party's conduct if the conduct "actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." Id. (quoting *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005)). The Court went on to note that it had deemed the following actions to be a significant restraint or interference with a parent's efforts to develop a relationship with a child: "(1) telling a man he is not the child's biological father, (2) blocking access to the child, (3) keeping the child's whereabouts unknown, (4) vigorously resisting the parent's efforts to support the child, or (5) vigorously resisting a parent's efforts to visit the child." Id. (citation omitted).

First, the Court notes that cases involving termination of parental rights are always fact specific. It is, therefore, somewhat difficult to equate the fact pattern of one case to another when trying to determine whether a failure to visit was willful. [Father] contends that his situation is directly analogous to that in *In re Lyric J.* Although there are some similarities, the Court finds that there are several important distinguishing facts. First, unlike the grandmother in *In re Lyric J.*, [Petitioners] were not afraid to allow [Father] to visit, nor did they make scheduling visitation difficult.

The evidence shows that from May to October of 2015, [Father] made six attempts to see the child. In May, he requested to see the child on Father's Day, and the C.'s agreed. On May 31, he requested to see the child the following weekend, and the C.'s agreed. Both visits were either cancelled or were not followed up on by [Father]. On July 15, [Father] requested to see the child because he would be in Cleveland for a whitewater rafting trip, but Kellee objected based on the last-minute nature of the request and the fact that the family already had plans. The Court does not find Kellee's decision unreasonable. In August, [Father] requested dates for visitation, and the C.'s informed him that August was wide open for scheduling a visit. This, of course, ultimately resulted in the disagreement between the parties about the location of the visit, which culminated in [Father] refusing to travel to Cleveland for a visit, stating to Kellee that "karma is karma and we shall engage in court," and announcing on social media that the C.'s were all "POS." [Father] requested an airport visit for October 14 and another visit on October 27, to which the C.'s did not respond. Kellee blocked [Father's] cell phone number because of the derogatory and threatening nature of his texts and social media posts. From October 2015 to the filing of the petition in August 2016, [Father's] only attempts at communication, other than the Facebook message sent to John, calling him a "POS," were via text. Those text messages cannot be construed as a legitimate attempt to schedule a visit with the child. Instead, the messages are insulting and threatening. The Court notes that during this entire time, [Father] never attempted to call John, call the C.'s landline, write the C.'s, or try any other form of communication other than texting Kellee. [Father] did not petition any court for visitation. In sum, the proof simply does not support [Father's] contention that the C.'s thwarted visitation with the child. The C.'s did quite the opposite. [Father] cannot behave in such a way that Kellee had to block his text messages, then complain that he could not communicate with Kellee via text to schedule a visit. In short, any difficulty [Father] had communicating with the C.'s was a problem of his own making.

With respect to willful failure to support, the law is clear that "biological parents must, as a general matter, support their children until they reach the age of majority.... The parent's obligation to support, as well as the child's right of support, exist regardless of whether a court order exists, and regardless of whether the parents were ever married." Tenn. Code Ann. §36-1-102(1)(H). It is again undisputed that [Father] did not pay any money for the support of the child during the four months preceding the filing of the petition. [Father] offers various reasons for his failure to provide support. First, [Father] contends that he was not required

-10-

to provide support until paternity was confirmed.  [Father] also contends that he was financially unable to provide support.  In his deposition, [Father] testified that he did not pay support because the C.'s "were keeping my kid and not working with me at all. So, they were not being flexible on any dates for me to see my son, at all, and I don't trust what they were gonna do with the money."  Finally, [Father] testified in his deposition that he did not pay support because "the courts have not told me to pay anything to them at this time."  The Court finds these excuses to be disingenuous.

First, [Father's] contention that he did not want to pay support until confirmation of paternity is inconsistent with his previous statements and behavior.  On two occasions, [Father] asked [Petitioners] for their address so that he could send money and gifts to the child.  [Father] never did.  In addition, [Father] told the C.'s several times, forcefully via text, that the child was his child.  [Father] cannot now come before this Court and use the lack of paternity confirmation as an excuse for his failure to support the child.  Furthermore, [Father] did not actively seek paternity confirmation after [Mother] was served or once the Alabama proceedings concluded.  Even when the present petition was filed, [Father] waited for a year before seeking paternity testing.  Again, [Father] cannot wait until the eve of trial to obtain paternity confirmation, then use the lack of such confirmation as an excuse for two years of failure to support.

With respect to ability pay, the Court first notes that [Father] did not provide any tax returns because, apparently, he has not filed any.  This is because some jobs were worked "under the table," according to [Father]. [Father] testified that he is currently enrolled in a helicopter academy and has been for some time.  Tuition of $80,000 was paid up front from trust funds from his father's death.[3]  Since May of 2015, [Father] has worked for JCM Performance as an apprentice technician, for MidSouth Aviation, T.T. Motosports, and SpeedStar Customs.  He is a professional chassis technician, and he builds and races motorcycles.  He provided an Affidavit of Income and Expenses from June 30, 2017 and prior, which reflects a net income of $2,933.33 and expenses of $2,924.05.  His expenses include $755.00 for attorney's fees.

The Court finds that [Father] had an ability to pay something toward the support of his child, even if only a meager amount.  Examining the Affidavit of Income and Expenses and assuming it to be true,[4] [Father] could have sent just $10.00 per month, which would have been better than

---

[3] Shortly before the hearing, [Father] came into a large sum of money from his father's business.  He now claims a monthly income of $6,300.00.

[4] Again, no supporting documentation for either income or expenses is contained in the record.

-11-

nothing. To the extent [Father] contends that he could not afford to send support payments because of his attorney fees, this argument was rejected by the Tennessee Court of Appeals in *In re Makenzie L.*, 2015 WL 3793788 (Tenn. Ct. App. Feb. 24, 2015) (rejecting the argument that "when parents are compelled to redirect their finances to seek legal representation to protect their right to parent their child, the abandonment by failure to pay financial support is not grounds for termination.").

In conclusion, the Court finds that the petitioners have established by clear and convincing evidence that [Father] willfully failed to visit the child and willfully failed to support the child. [Father's] efforts at visitation early on were half-hearted at best. When [Father] finally appeared ready to actually visit the child, he refused to do so because he did not like the location chosen by the petitioners. His subsequent actions resulted in Kellee having to block him from texting, and [Father] made no genuine effort at visitation since October of 2015. The same is true with respect to support. [Father] offered various excuses as to why he did not support the child, and the Court is persuaded by none of them. The Court's overall impression of [Father] with respect to his efforts at a relationship with his child are that he talked a lot but did very little.

**[The Trial Court's Best Interest Analysis]**

\*\*\*

The Court finds that the following factors are relevant in this proceeding:

> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe....
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to §36-5-101.

First, with respect to factors three and four, [Father] has not seen the child in over two years. [Father] has no relationship with the child. In his

deposition, [Father] testified that he believed the child would recognize him because "I set there and talked to him while he was in the womb for months and months, we watched motorcycles, played with things. And when he was born and heard sounds I made he lit up, he knew exactly who I was." At trial, however, [Father] acknowledged that he would be a stranger to the child. In his deposition, [Father] acknowledged that when he met with the guardian ad litem, she discussed therapeutic visitation.[5] He denied that she instructed him to take steps to set up therapeutic visitation. He also denied that she discussed reactive attachment disorder with him. The Court finds that these denials are not credible. In his deposition, [Father] was asked whether he had taken any steps to get himself reacquainted with the child, and he testified that he did not know.

With respect to factor nine, [Father] did not make child support payments. Even when he came into money shortly before trial, he sent only $250.00 for two months.

With respect to factors five and seven, the Court first notes that the proposed physical environment of [Father's] home appears to be healthy and safe. [Father] has recently moved to a larger home in Florida that would have ample space for the child, and he has worked with a friend to locate a pediatrician and daycare services. This factor weighs in [Father's] favor. However, the Court must also consider that that [Petitioners] are the only parents this child has known, and the child knows them as "mom" and "dad."[6] [Petitioners] have two older daughters who interact with the child like a brother. [Petitioners] have provided the child with a safe, stable, and loving home since the child was approximately seven months old. They have paid for and provided the child with food, shelter, clothing, and doctor visits. If the child were removed from this home and placed with [Father], the Court finds that the possibility for significant emotional harm exists.

Having considered the foregoing factors, the testimony of the parties, and the record as a whole, and keeping in mind the significant consequences of severing the child's ties with his biological father, the Court finds by clear and convincing evidence that it is in the child's best interest to remain with [Petitioners] in the only home the child has known.

Conclusion.

---

[5] At trial, the guardian ad litem advocated for termination of parental rights and for custody to remain with [Petitioners].

[6] [Petitioners] testified that if they were permitted to adopt the child, they would tell him of the adoption at the appropriate age.

In sum, the Court finds that [Father's] parental rights should be terminated for abandonment based on clear and convincing evidence of willful failure to visit the child and willful failure to support the child. The Court further finds that it is in the child's best interest to remain with [Petitioners] and that their adoption proceeding shall move forward.

(Footnotes in original but renumbered). Father appealed to this Court following entry of this order. Later in November 2017, the Trial Court entered its Final Order of Adoption, granting adoption of the Child to Petitioners and also changing the Child's name.

## Discussion

Although not stated exactly as such, Father raises the following issues on appeal: 1) whether the Trial Court lacked subject matter jurisdiction under the UCCJEA to adjudicate the termination petition; 2) whether the Trial Court erred in entering the final order of adoption after Father perfected his appeal of the judgment terminating his parental rights; 3) whether the Trial Court erred in finding the ground of willful failure to visit; 4) whether the Trial Court erred in finding the ground of willful failure to support; and, 5) whether the Trial Court erred in finding that termination of Father's parental rights is in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[7] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae*

---

[7] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(I)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[8] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[9] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the

---

[8] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[9] Tenn. Code Ann. § 36-1-113(i).

existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme

Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). As such, we review each of the grounds for termination.

We first address whether the Trial Court lacked subject matter jurisdiction under the UCCJEA to adjudicate the termination petition. Father contends on appeal that the Trial Court lacked subject matter jurisdiction under the UCCJEA because the Alabama Court made the initial custody determination and never relinquished its exclusive, continuing jurisdiction. This issue was not raised below. However, it is well-established that subject matter jurisdiction may be examined at any point in a case. "The lack of subject matter jurisdiction is so fundamental that it requires dismissal whenever it is raised and demonstrated." *First American Trust v. Franklin-Murray*, 59 S.W.3d 135, 141 (Tenn. Ct. App. 2001). "[P]arties cannot confer subject matter jurisdiction on a trial or an appellate court by appearance, plea, consent, silence, or waiver." *Id*. at 140-41. Concerning the multi-step analysis to be conducted under the UCCJEA, this Court has stated:

> Under the UCCJEA, a court confronted with a petition to modify another state's child custody determination must undertake a three-part threshold jurisdictional analysis. First, the court must decide whether the state that made the initial custody determination retains exclusive, continuing jurisdiction. Tenn. Code Ann. § 36-6-218(1)-(2). Second, the court must decide whether it would have jurisdiction to make an initial custody determination under the present circumstances. Tenn. Code Ann. § 36-6-218. The court has subject matter jurisdiction to modify the other state's child custody determination only if the other state has lost its exclusive, continuing jurisdiction or declined to exercise it and the court of the new state would have jurisdiction to make an initial custody determination under the present circumstances. Once a court determines that it has subject matter jurisdiction under the first two steps of the jurisdictional analysis, it must then proceed to the third step and determine whether it may or must decline to exercise its modification jurisdiction on one of the three grounds specified in the UCCJEA. Tenn. Code Ann. §§ 36-6-221 to -223.

*Staats v. McKinnon*, 206 S.W.3d 532, 547-48 (Tenn. Ct. App. 2006) (footnote omitted). Whether a court has jurisdiction under the UCCJEA is a question of law which we review *de novo* with no presumption of the correctness of the ruling of the lower court. *Staats*, 206 S.W.3d at 542.

Petitioners, for their part, argue that the UCCJEA does not even apply as this is an adoption case. According to Petitioners, the Child was placed with them in Tennessee under the terms of the ICPC and Alabama has nothing more to do with the case. However, an examination of Tennessee statutes and cases appear to contradict Petitioners' position. First, we look to the UCCJEA, codified in Tennessee law at Tenn. Code Ann. § 36-6-201 *et seq*. The UCCJEA's purposes are laid out as follows:

> This part shall be liberally construed and applied to promote its underlying purposes and policies. This part should be construed according to its purposes, which are to:
>
> (1) Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being;
>
> (2) Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child;
>
> (3) Discourage the use of the interstate system for continuing controversies over child custody;
>
> (4) Deter abductions of children;
>
> (5) Avoid relitigation of custody decisions of other states in this state; and
>
> (6) Facilitate the enforcement of custody decrees of other states.

Tenn. Code Ann. § 36-6-202 (2017). A child custody proceeding under the UCCJEA is defined as:

> [A] proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue. "Child custody proceeding" includes a proceeding for divorce, separation, neglect, abuse, dependency, guardianship, paternity, *termination of parental rights*, and protection from domestic violence, in which the issue may appear. "Child custody

-19-

proceeding" does not include a proceeding involving juvenile delinquency, contractual emancipation, or enforcement under part 3 of this chapter;

Tenn. Code Ann. § 36-6-205(4) (2017) (emphasis added).

Tennessee courts have applied the UCCJEA in parental rights termination cases a number of times. *See In re Caleb F.N.P.*, No. M2013-00209-COA-R3-PT, 2013 WL 5783141 (Tenn. Ct. App. Oct. 25, 2013), *no appl. perm. appeal filed* (analyzing the UCCJEA in a parental rights termination case and concluding Tennessee retained exclusive continuing jurisdiction to decide the petition); *In re Z.T.S.*, No. E2007-00949-COA-R3-PT, 2008 WL 371184 (Tenn. Ct. App. Feb. 12, 2008), *no appl. perm. appeal filed* (concluding the trial court lacked jurisdiction under the UCCJEA to adjudicate a termination petition).

Meanwhile, with respect to the ICPC, "[t]he purpose of the Compact is to facilitate cooperation between states regarding the placement of children." *In re Isaiah R.*, 480 S.W.3d 535, 538-39 (Tenn. Ct. App. 2015). At oral arguments, the Guardian ad Litem cited the following ICPC retention of jurisdiction provision to support the case that the Alabama Court effectively had "discharged" the case and thus, its jurisdiction:

(a) The sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment and disposition of the child which it would have had if the child had remained in the sending agency's state, until the child is adopted, reaches majority, becomes self-supporting or is discharged with the concurrence of the appropriate authority in the receiving state. Such jurisdiction shall also include the power to effect or cause the return of the child or its transfer to another location and custody pursuant to law. The sending agency shall continue to have financial responsibility for support and maintenance of the child during the period of the placement. Nothing contained herein shall defeat a claim of jurisdiction by a receiving state sufficient to deal with an act of delinquency or crime committed therein.

Tenn. Code Ann. § 37-4-201 (2014).

We are unpersuaded that the ICPC resolves the jurisdictional issue. As articulated in one scholarly piece, "[t]he term 'jurisdictional arrangements' as used in the ICPC should not be confused with the concept of subject matter jurisdiction required of a court to make a custody determination." *Jurisdiction Over Children in Interstate Placement: The UCCJEA, Not the ICPC, Is the Answer*, 41 Fam. L.Q. 145, 147 (Spring 2007). "Courts interpreting the 'jurisdictional' provisions of the ICPC have consistently held

that the ICPC is not the appropriate interstate document by which to determine jurisdiction." *Id*. at 151. Placement, as such, is not contested here. No one disputes the soundness of the Child's placement. Rather, the question is whether a Tennessee court may make the ultimate modification to another state's initial custody determination—that is, termination of a parent's parental rights. Petitioners appear to overlook the fact that no adoption can take place while Father's parental rights to the Child are intact, and the Alabama Court awarding custody of the Child to Petitioners in Tennessee in an ICPC-approved placement does not resolve the jurisdictional issue which is distinct from placement. We conclude that, given the plain language of the UCCJEA and Tennessee case law interpreting it, the UCCJEA is implicated in this parental rights termination case where the initial custody determination was rendered in Alabama. We therefore proceed to apply the UCCJEA to determine whether the Trial Court had subject matter jurisdiction to decide this case.

The Child and Petitioners live in Tennessee. Father lives in Florida. Alabama's role in the case appears to have receded entirely. Father raises two points in support of his position: (1) Mother still lives in Alabama; and (2) Father's complaint for paternity and child support remained pending in the Alabama Court at the time of trial. In *Cliburn v. Bergeron*, this Court explained:

> The UCCJEA establishes a clear jurisdictional hierarchy to decide which court will have power to decide child custody and visitation cases. Like with the [Parental Kidnapping Prevention Act], at the top of the hierarchy is a court with exclusive continuing jurisdiction. If a court has entered a valid custody order . . . and one of the parties or the child continues to live in the state, that court has the exclusive right to decide if the order should be permanently modified. The court with exclusive continuing jurisdiction has what might be called "a right of first refusal." Courts of other states may not modify an order (assuming a parent or child continues to live in the state that issued an order) unless the court that issued the order gives permission for another state to decide the issue. . . .

*Cliburn v. Bergeron*, Nos. M2002-01386-COA-R3-CV, M2001-03157-COA-R3-CV, 2002 WL 31890868, at *8 (Tenn. Ct. App. Dec. 31, 2002) (quoting MATTHEW BENDER & CO., INC., MODERN CHILD CUSTODY PRACTICE § 3-10 &-12), *no appl. perm. appeal filed*.

Matters under the UCCJEA are complex and quite intricate. We deem it necessary to lay out several of the pertinent laws relevant to this case. Tenn. Code Ann. § 36-6-216 provides:

(a) Except as otherwise provided in § 36-6-219, a court of this state has jurisdiction to make an initial child custody determination only if:

(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six (6) months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

(2) A court of another state does not have jurisdiction under subdivision (a)(1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under §§ 36-6-221 or 36-6-222, and:

(A) The child and the child's parents, or the child and at least one (1) parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

(B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;

(3) All courts having jurisdiction under subdivision (a)(1) or (a)(2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under §§ 36-6-221 or 36-6-222; or

(4) No court of any other state would have jurisdiction under the criteria specified in subdivision (a)(1), (a)(2), or (a)(3).

(b) Subsection (a) is the exclusive jurisdictional basis for making a child-custody determination by a court of this state.

(c) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child-custody determination.

Tenn. Code Ann. § 36-6-216 (2017).

The term "home state" is defined as follows:

(7) "Home state" means the state in which a child lived with a parent or a person acting as a parent for at least six (6) consecutive months

immediately before the commencement of a child custody proceeding. In the case of a child less than six (6) months of age, "home state" means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period;

Tenn. Code Ann. § 36-6-205(7) (2017).

Regarding exclusive and continuing jurisdiction, Tenn. Code Ann. § 36-6-217 provides:

(a) Except as otherwise provided in § 36-6-219, a court of this state which has made a child-custody determination consistent with this part has exclusive, continuing jurisdiction over the determination until:

(1) A court of this state determines that neither the child, nor the child and one (1) parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships; or

(2) A court of this state or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this state.

(b) A court of this state which has made a child-custody determination and does not have exclusive, continuing jurisdiction under this section may modify that determination only if it has jurisdiction to make an initial determination under § 36-6-216.

Tenn. Code Ann. § 36-6-217 (2017).[10]

Tenn. Code Ann. § 36-6-218 provides:

Except as otherwise provided in § 36-6-219, a court of this state may not modify a child-custody determination made by a court of another state

---

[10] Alabama has an almost identical statute under its own UCCJEA codification at Ala. Code § 30-3B-202. We note that the Alabama comment to that statute states: "This section follows Section 202 of the Uniform Child Custody Jurisdiction and Enforcement Act except that the language 'exclusive, continuing jurisdiction' has been changed to 'continuing, exclusive jurisdiction' so as to be consistent with the Uniform Interstate Family Support Act (UIFSA)."

unless a court of this state has jurisdiction to make an initial determination under § 36-6-216(a)(1) or (2), and:

(1) The court of the other state determines it no longer has exclusive, continuing jurisdiction under § 36-6-217 or that a court of this state would be a more convenient forum under § 36-6-221; or

(2) A court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.

Tenn. Code Ann. § 36-6-218 (2017).

Finally, Tenn. Code Ann. § 36-6-221 states:

(a) Except as otherwise provided in § 36-6-219, a court of this state may not exercise its jurisdiction under this part if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child has been commenced in a court of another state having jurisdiction substantially in conformity with this part, unless the proceeding has been terminated or is stayed by the court of the other state because a court of this state is a more convenient forum under § 36-6-222.

(b) Except as otherwise provided in § 36-6-219, a court of this state, before hearing a child custody proceeding, shall examine the court documents and other information supplied by the parties pursuant to § 36-6-224. If the court determines that a child custody proceeding has been commenced in a court in another state having jurisdiction substantially in accordance with this part, the court of this state shall stay its proceeding and communicate with the court of the other state. If the court of the state having jurisdiction substantially in accordance with this part does not determine that the court of this state is a more appropriate forum, the court of this state shall dismiss the proceeding.

(c) In a proceeding to modify a child custody determination, a court of this state shall determine whether a proceeding to enforce the determination has been commenced in another state. If a proceeding to enforce a child custody determination has been commenced in another state, the court may:

(1) Stay the proceeding for modification pending the entry of an order of a court of the other state enforcing, staying, denying, or dismissing the proceeding for enforcement;

(2) Enjoin the parties from continuing with the proceeding for enforcement; or

(3) Proceed with the modification under conditions it considers appropriate.

Tenn. Code Ann. § 36-6-221 (2017).

The Alabama Court rendered the initial custody determination, therefore cementing its exclusive, continuing jurisdiction until one of the statutory conditions necessary to lift it occurred. Also, Mother continues to live in Alabama, which appears to prevent a court of another state from exercising jurisdiction on the basis that all relevant parties left Alabama. All circumstantial evidence in the record, including the testimony of Kellee C., Mother's sister, indicates that Mother never has moved out of the State of Alabama. Finally, there is evidence that Father still has a pending action in Alabama for paternity and child support. All of these facts tend, superficially at least, to bolster Father's argument. However, a closer inspection reveals Alabama's continued jurisdictional grasp of the case to be far less sure.

First, the record contains orders from the Alabama Court granting DHR's motion to close and dismissing Father's dependency petition. Second, while Mother continues to live in Alabama, Mother also has submitted an oath reflecting her desire to surrender her parental rights to the Child. Mother has stated her position unequivocally and going forward will have no legal interest in proceedings regarding the Child upon finalization of her bid to surrender. That would be equally true either in Tennessee or Alabama. Finally, as to Father's pending action in Alabama for paternity and child support, Father's paternity already has been established conclusively by DNA testing. There is nothing new that the Alabama Court can glean in that area.

Alabama's connection to this case is now so tenuous as to be non-existent. The only parent remaining in Alabama wishes to surrender her parental rights. Father only moved to Alabama in the first place to be closer to the legal proceedings there but no longer lives in Alabama. The relationship between Mother and the Child now is so attenuated that there is no longer any significant connection to or substantial evidence in Alabama. To be clear, Mother could not stipulate to subject matter jurisdiction. Instead, we hold that the fact of Mother's consent to termination and adoption nullifies her continued residence in Alabama as a barrier to the Trial Court's exercise of subject matter jurisdiction. There is no prospect here of the kind of jurisdictional competition between

-25-

states the UCCJEA was designed to prevent. We conclude that Alabama no longer retains exclusive and continuing jurisdiction in this case.

Turning to the question of whether Tennessee may assert jurisdiction, it is undisputed that Tennessee is the home state of the Child. The Child has lived here for years now. Furthermore, we find no reason why the Trial Court should decline to decide the case. Having answered the three part threshold jurisdictional analysis as we have, we hold that the Trial Court properly exercised subject matter jurisdiction in adjudicating the petition to terminate Father's parental rights.

We next address whether the Trial Court erred in entering the final order of adoption after Father perfected his appeal of the judgment terminating his parental rights. Father argues that because the Trial Court entered an adoption order while his appeal of the termination of his parental rights is pending, he may lose the right to contest the adoption if the appellate process is delayed. Father cites Tenn. Code Ann. § 36-1-122, which provides as relevant:

> (b)(1) After the final order of adoption is entered, no party to an adoption proceeding, nor anyone claiming under such party, may later question the validity of the adoption proceeding by reason of any defect or irregularity therein, jurisdictional or otherwise, but shall be fully bound by the order, except for such appeal as may be allowed by law.

> (2) In no event, for any reason, shall an adoption be overturned by any court or collaterally attacked by any person or entity after one (1) year from the date of entry of the final order of adoption by a court of competent jurisdiction. This provision is intended as a statute of repose.

Tenn. Code Ann. § 36-1-122 (2017).

As it stands, the Trial Court in two orders adjudicated all matters put before it as to the petition filed by Petitioners seeking to terminate Father's parental rights and to adopt the Child. Father timely appealed. Father now is exercising fully his appeal as of right. The possible outcome he hypothesizes is a mere conjecture, and is one that, given our decision as to the termination of Father's parental right, is now moot. We find no merit to this issue.

We now turn to the grounds for termination of Father's parental rights found by the Trial Court. The Trial Court found two grounds under abandonment against Father, which are established by statute as follows:

-26-

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (2017).

The two relevant grounds under abandonment are willful failure to visit and support:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2017).

"A biological parent's willful failure to support or visit is not excused by a custodial parent's or third party's conduct unless the conduct either actually prevents the parent from performing his or her duty to support or visit or amounts to a significant restraint or interference with the parent's efforts to support or develop a relationship with his or her child." *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at \*5 (Tenn. Ct. App. Nov. 25, 2003) (citation omitted), *no appl. perm. appeal filed*.

We now address whether the Trial Court erred in finding the ground of willful failure to visit. Father argues that Petitioners blocked him from enjoying visitation with the Child. The Trial Court made detailed findings as to this issue. The evidence does not preponderate against the Trial Court's findings on this or any other issue. This is especially so given the Trial Court's unfavorable credibility determination as to Father.

Like the Trial Court, we conclude that Father's problems with communicating with Petitioners were of Father's own making. Father behaved woefully and spitefully toward Petitioners. In spite of that, Petitioners left alternative means of communication open to Father, of which he did not avail himself. Father chose instead to quibble over arrangements to meet with Petitioners to visit the Child. In the four month period prior to the filing of the petition to terminate parental rights, Father could have and should have visited with the Child and yet did not. We find, as did the Trial Court, that the ground of willful failure to visit was proven against Father by clear and convincing evidence.

We next address whether the Trial Court erred in finding the ground of willful failure to support. Father did not pay any support for the Child during the four months leading up to the petition seeking to terminate Father's parental rights. Father offers a range of explanations. On the one hand, Father argues on appeal that it never was established that he had the means during the relevant period to pay support. On the other hand, Father argues that it was reasonable for him to withhold support until he was certain he was the Child's biological father. These alternative explanations are contradictory rather than complementary, as Father acknowledges he could pay but that he did not because he was uncertain he was the Child's father.

"It is well settled in Tennessee that biological parents must, as a general matter, support their children until they reach the age of majority." *State ex rel. Hayes v. Carter*, No. W2005-02136-COA-R3-JV, 2006 WL 2002577, at *2 (Tenn. Ct. App. July 6, 2006), *no appl. perm. appeal filed*. "The parent's obligation to support, as well as the child's right to support, exist regardless of whether a court order exists, and regardless of whether the parents were ever married." *Id*.

Initially, we, like the Trial Court, believe Father may not assert his paternity from the very beginning of the case, even insisting that the Child be born in Florida, and then use a lack of absolute certainty about paternity to excuse his failure to support. Furthermore, it is more than clear and convincing from Father's testimony that his basis for not sending money was his ever-present hostility toward Petitioners, not a lack of means. Finally, the Trial Court found that Father is a professional chassis technician, who could have and should have been able to pay support for the Child during the relevant four month period, even if his support was minimal. None of Father's excuses for failing to pay support hold any merit. We find, as did the Trial Court, that the ground of willful failure to support was proven against Father by the standard of clear and convincing evidence.

The final issue we address is whether the Trial Court erred in finding that termination of Father's parental rights is in the Child's best interest. The statutory factors to consider are as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2017).

We note, as did the Trial Court, that certain factors favor Father. Father, for instance, has inherited a large sum of money. Father has a large home in Florida. In material terms, Father could provide for the Child. However, the factors weighing in Father's favor are outweighed heavily by those against. As found by the Trial Court, Father made no child support payments other than the $500.00 he made after he inherited this sum of money. Father, by his own actions as we have discussed above, has no relationship with the Child whatsoever. This contrasts sharply with Petitioners' deep familial relationship with the Child.

Father has made various attempts in this case to assert his fatherhood, like moving to Alabama to be closer to proceedings there, as well as filing various petitions. Nevertheless, Father failed to follow up in any meaningful way. We find no error in the Trial Court's decision that termination of Father's parental rights is in the Child's best interest. We affirm the judgment of the Trial Court in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Dustin R., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE