IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 1, 2020

**IN RE: BRAELYN S.**

**Appeal from the Chancery Court for Sullivan County**
No. 19-CK-41754M      John S. McLellan, III, Judge

_____

**No. E2020-00043-COA-R3-PT**
_____

Father appeals the termination of his parental rights. The trial court found grounds for termination by abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability and willingness to assume legal and physical custody of the child. The trial court also found termination was in the best interests of the child. We affirm in part and reverse in part, but affirm the termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, J., joined, RICHARD H. DINKINS, J., filing a separate concurring and dissenting opinion.

Kenneth E. Hill, Kingsport, Tennessee, for the appellant, Michel S.

Lindsay Katheryn Earhart, Kingsport, Tennessee, for the appellee, Kayla B. and Nick B.

**OPINION**

**BACKGROUND**

In 2013, Braelyn S. ("Braelyn") was born to Petitioner/Appellee Kayla B. ("Mother") and Respondent/Appellant Michel S. ("Father") in Norton, Virginia.[1] Father submitted a voluntary acknowledgment of paternity at the time of birth. On the day following Braelyn's birth, Father moved to Atlanta, Georgia to live with his fiancée and a

---

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

separate child they conceived together. Mother and her son lived in Virginia, where Father would occasionally travel to visit in the months following Braelyn's birth. Father's visits continued until May or June 2014, when he took Braelyn to Atlanta to visit with his family without Mother's consent or awareness. After Father returned Braelyn to Virginia, Mother required that all future visitation occur only after the terms of visitation were put into writing. Following this incident, Father stopped providing occasional support to Mother for Braelyn's care. Mother also began blocking Father's cell phone number intermittently following the incident.

On June 21, 2014, Father filed a petition for custody *pro se* in the Scott County (Virginia) Juvenile Court in an effort to obtain visitation with Braelyn. Father was ordered to obtain a home study by the juvenile court during a hearing on January 7, 2015.[2] Efforts to mediate the dispute ended after Father hung up when Mother suggested that she have primary custody of Braelyn. Father was unable to afford the $1,500.00 fee for a home study, and the juvenile court dismissed Father's petition for custody on August 15, 2015. Father did not pursue visitation in any court following this dismissal. However, Father continued his efforts to call Mother and seek informal visitation. Mother and Father talked at least four or five times in the years after Father took Braelyn to Atlanta. On the rare occasions where Mother and Father talked, conversations ended quickly after Mother demanded that any visitation terms be placed in writing. Both parties recognized that Mother was essentially requiring that Father obtain a court order to visit Braelyn.

Mother moved to Kingsport, Tennessee in March 2015 with her now-husband, Nick B. ("Step-Father"). Mother and Step-Father were married in June 2016 and live with Braelyn and two children born of their marriage. In March 2018, Mother called Father to ask him to surrender his parental rights to Braelyn. Father quickly rejected the request and later sent messages that led Mother to block his cell phone number again. Mother and Father did not speak again until the present legal matter commenced. At the time that the petition was filed, Father lived with his fiancée and two children in Sandy Springs, Georgia and earned approximately $35,000.00 as a financial underwriter.

Mother and Step-Father filed a petition in Sullivan County Chancery Court ("the trial court") to terminate Father's parental rights and allow Step-Father to adopt the child on January 30, 2019. Mother and Step-Father sought termination on the grounds of abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability and willingness to personally assume physical and legal custody or financial responsibility of Braelyn. An attorney was appointed to represent Father, and that attorney accepted service on Father's behalf. Mother and Step-Father filed a motion for default judgment after receiving no answer from Father. An amended petition was later filed which restated the three existing grounds for termination in the trial court on June 4, 2019. In a

---

[2] On that date, Father interacted with the Child for the last time during a meeting at Mother's attorney's office.

response filed on July 22, 2019, Father denied that the grounds for termination existed and that termination was in the best interests of Braelyn. Father made a similar denial in a filing in response to the amended petition.

The trial court held a hearing regarding the petition to terminate on September 25, 2019. Father conceded that he failed to visit and support Braelyn in the four months preceding the filing of the petition to terminate his rights; however, he contended that those failures were not willful. Father testified that his efforts to visit and support Braelyn were thwarted by Mother, who consistently blocked calls from him and refused to allow him to visit with his son. When Mother and Father did speak over the phone, Father asked to see his son and obtain visitation. Father also claimed to offer child support as a "bribe" to see his son and later defended his characterization of the offer to provide child support while testifying. While Father knew Mother and Braelyn had moved to Kingsport, he claimed that he did not know specifically where Mother and Braelyn lived and was unable to contact them by mail, send any support to Braelyn, or petition a state court to obtain visitation rights. While Father had previously sent a gift to Braelyn to Braelyn's maternal grandmother's address, he said he did not know whether the maternal grandmother still lived there and did not reach out to Braelyn's family through that address. In addition, Father testified that he continued to live with his fiancée and raise his two other children in Sandy Springs, Georgia, where he and his family have no alcohol or substance abuse issues. Father stated that he was willing and able to take custody and financially support Braelyn. While he conceded that a reintroduction could be hard for Braelyn, Father stated that "it's what needs to be done" and that he believed that Braelyn could adjust to the circumstances.

At trial, Mother testified that Father permanently left for Georgia the day after Braelyn was born. For more than a year, Mother claimed that Father occasionally visited and provided support for Braelyn until Father took Braelyn to Atlanta without Mother's consent. Until this time, Mother conceded that Father would not harm Braelyn or place him at risk during visitation. Following this incident, Mother stated that she would not allow Father to visit without what amounted to a written court order. Mother also stated that Father failed to provide support following Mother's cessation of visitation. Mother acknowledged that she did not inform Father of her move to Kingsport, even as Father's petition for visitation remained active in Scott County, Virginia. Following her request that Father surrender his parental rights, Mother blocked Father's cell phone number through the termination hearing, which included the four-month period before the filing of the petition. By the time she filed the petition to terminate, she testified that she would not allow Braelyn to see Father without an explicit court order. On cross-examination, she admitted that her blocking of Father's phone number was a substantial hindrance from Father's ability to visit but stated "that wasn't the only way to get in contact with [Braelyn]."

Step-Father also testified at the hearing, stating that he had lived with Braelyn since

2015 and that Father had not interacted with Braelyn since then. Step-Father stated that Braelyn has called him "Daddy" since he was two years old. Father's fiancée also testified, stating that she and Father had a stable living situation with their two children and could take on the care of another child if needed.

Following the hearing, the trial court issued an order terminating Father's parental rights on January 3, 2020. The trial court found that Father had abandoned Braelyn through a failure to visit and a failure to support. Further, the trial court disregarded Father's claims of a lack of willfulness, stating that Father could have learned Mother's address or found alternative ways to contact Mother, request visitation, or send support for Braelyn. The trial court also found that Father failed to manifest a willingness and ability to assume legal and physical custody or financial responsibility by his failure to visit or support Braelyn. The trial court stated that Father's lack of a relationship or legal responsibility with Braelyn and the likelihood that placing Braelyn in Father's care could lead to physical and psychological harm to the child. In addition, the trial court found clear and convincing evidence that terminating Father's parental rights was in Braelyn's best interests. Namely, the trial court cited Father's failure to make contact, failure to support, lack of a meaningful relationship, and likelihood of harming the child's emotional, psychological, and medical conditions as factors that supported termination. After the order was entered, Father timely filed a notice of appeal.

## ISSUES PRESENTED

In his appeal, Father raised four issues, which we slightly restate as follows:

1. Whether the trial court erred in terminating Father's parental rights on the ground of abandonment for failure to visit?
2. Whether the trial court erred in terminating Father's parental rights on the ground of abandonment for failure to provide support?
3. Whether the trial court erred in terminating Father's parental rights on the ground of failing to manifest an ability and willingness to personally assume legal and physical custody of the child?
4. Whether the trial court erred in finding that termination of Father's parental rights was in the best interests of the child?

## STANDARD OF REVIEW

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*,

405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113I; *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interests by clear and convincing evidence. Tenn. Code Ann. § 36-3-113I; *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

The trial court's ruling that the evidence sufficiently supports termination of

- 5 -

parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.,* 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.,* 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

DISCUSSION

Father challenges the three grounds for termination found by the trial court and also appeals the finding that termination was in the best interest of the child.

I.      Grounds for Termination

A.      Abandonment

Father first argues that the trial court erred when finding clear and convincing evidence to establish termination through abandonment. *See* Tenn. Code Ann. § 36-1-113(g)(1). For the purpose of this case, abandonment can occur when a parent or guardian failed to visit or support a child for a period of four consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). A failure to visit "means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(D). A lack of willfulness can serve as an affirmative defense to the ground of failure to visit or support. Tenn. Code Ann. § 36-1-102(1)(I). However, a parent "shall bear the burden of proof that the failure to visit or support was not willful" and must establish the lack of willfulness by a preponderance of evidence. *Id.*

In this case, Father admits that he failed to visit or support Braelyn in the four months before the original petition was filed, but contends that this failure was not willful because Mother thwarted his efforts. Mother argues that Father failed to establish that his

- 6 -

failure to visit or support was not willful and that clear and convincing evidence exists to support the trial court's finding of abandonment.[3]

We must first determine the correct four-month period used to determine abandonment by failure to visit and failure to support. *See* Tenn. Code Ann. §§ 36-1-102; 36-1-113(g)(1). The trial court stated that the relevant four-month period in the present case was February 4, 2019 to June 4, 2019, which were the four months preceding the filing of an amended petition. However, the amended petition did not add or subtract any grounds for termination and did not materially alter the claims made by Mother. As this amended petition was not a "separate and distinct" petition from the original, *see **In re P.G.***, No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at \*7 (Tenn. Ct. App. Aug. 17, 2018), the proper period to consider abandonment was September 30, 2018 to January 30, 2019, the four months preceding the filing of the original petition. As the trial court's findings of fact and conclusions of law include sufficient information to consider the correct four-month period, any error from the use of the incorrect four-month period is harmless. *See **In re J'Khari F.***, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at \*9 (Tenn. Ct. App. Jan. 31, 2019). In addition, while the relevant timeline to establish a failure to visit or support is four months before the filing of the termination petition, "courts often consider events that occurred prior to the relevant period to determine if there was interference with the biological parent's attempts to visit or support the child." ***In re Alex B.T.***, No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at \*6 (Tenn. Ct. App. Nov. 15, 2011) (citing ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 801 (Tenn. 2007); ***In re S.M.***, 149 S.W.3d 632 (Tenn. Ct. App. 2004)). With this law in mind, we proceed to consider both types of abandonment alleged in this case: failure to visit and failure to support.

### 1. Failure to Visit

We begin with failure to visit. Again, there is no dispute that Father failed to visit Braelyn in the four months preceding the filing of the initial termination petition. Father contends, however, that his failure to visit was excused because Mother thwarted his efforts. Regarding willfulness and failure to visit, our Supreme Court has held,

> We have held that when a parent attempts to visit his child but is "thwarted by the acts of others," the failure to visit is not willful. ***In re Adoption of***

---

[3] During the proceedings in the trial court, Mother raised an additional argument: that Father waived the affirmative defense that his conduct was not willful in failing to properly plead it. However, Mother did not object to testimony regarding willfulness at trial. *See generally **McLemore v. Powell***, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997) (explaining the standard for trial by implied consent). Moreover, although the trial court clearly considered Father's argument as to willfulness and Father again argues that his conduct was not willful, Mother did not raise any argument in her brief that this affirmative defense was waived. Mother's waiver argument was therefore waived by both her failure to designate it as an issue on appeal and argue it in her appellate brief.

*A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *see In re F.R.R., III*, 193 S.W.3d at 530. Thus, a parent's failure to visit is willful when it is "the product of free will, rather than coercion." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).

* * *

A parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child. *In re Audrey S.*, 182 S.W.3d at 864.

*In re M.L.P.*, 281 S.W.3d 387, 392–93 (Tenn. 2009).

Tennessee law is clear that thwarting visitation may result in a lack of willfulness. Indeed, our courts have often held that a significant restraint or interference with a parent's efforts to visit a child can occur by: "(1) telling a man he is not the child's biological father, (2) blocking access to the child, (3) keeping the child's whereabouts unknown, (4) vigorously resisting the parent's efforts to support the child, or (5) vigorously resisting a parent's efforts to visit the child." *In re S.M.*, 149 S.W.3d 632, 642 n.18 (Tenn. Ct. App. 2004) (citations omitted); *see also In re Apex R.*, 577 S.W.3d 181, 190–91 (Tenn. Ct. App. 2018) (same); *In re Audrey S.*, 182 S.W.3d 838, 864 n.34 (Tenn. Ct. App 2005) (same); *In re Adoption of Muir*, No. M2004-02652-COA-R3-CV, 2005 WL 3076896, at *5 n.13 (Tenn. Ct. App. Nov. 16, 2005) (same).

Applying this test, however, is not a mechanical process. In fact, courts faced with determining whether a significant restraint has occurred reach different conclusions based on the circumstances of each case. Certainly, when "the parents' visits with their child have resulted in enmity between the parties and where the parents redirect their efforts at maintaining a parent-child relationship to the courts the evidence does not support a 'willful failure to visit' as a ground for abandonment." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). In *A.M.H.*, two biological parents initiated legal action to regain custody of their daughter after being denied access to her by the child's custodians. *Id.* Their efforts were described as an active pursuit of a relationship that had been thwarted, and our Supreme Court found that the parents had not willfully failed to visit their children. *Id.* This Court has since interpreted that holding to mean that "antagonism between biological parents and legal guardians may excuse a failure to visit." *In re Justin P.*, No. M2017-01544-COA-R3-PT, 2018 WL 2261187, at *6 (Tenn. Ct. App. May 17, 2018); *In re Alex B.T.*, No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at *9 (Tenn. Ct. App. Nov., 15, 2011) (holding that a significant restraint existed when appellants acted to limit a mother's interactions with her children despite having court-ordered visitation). Accordingly, we have held that a parent did not willfully fail to visit his or her child if she was actively pursuing visitation in the court system prior to the filing of the termination petition. *In re*

*Chelbie F.*, No. M2006-01889-COA-R3-PT, 2007 WL 1241252, at *6 (Tenn. Ct. App. Apr. 27, 2017).

Under certain circumstances, a demand that a parent seek recourse from the courts has also constituted a substantial restraint on the parent's efforts to maintain a relationship with a child. *In re S.M.*, 149 S.W.3d 632, 642–43 (Tenn. Ct. App. 2004). In *S.M.*, an adoption agency informed a biological father that the parent would have to litigate if he wanted to develop a relationship with his child. *Id.* at 643. The father subsequently hired counsel and filed a petition to establish parentage. *Id.* Even though a juvenile court failed to timely dispose of his petition, this Court held that the father made an effort to establish a relationship through the courts and had a justifiable excuse for failing to visit the child before the termination petition was filed. *Id.* Thus, the *S.M.* court found substantial restraint due to the "adoption agency's position that the biological parent 'litigate if he [or she] desired to develop a relationship with [the] child[.]'" *In re Alex B.T.*, 2011 WL 5549757, at *9 (quoting *In re S.M.*, 149 S.W.3d at 643).

While the aforementioned cases involve the parent taking legal action to enforce his or her rights, a failure to take legal action is not always fatal to a claim of significant restraint. This is most typically true when the non-custodial parent cannot afford to hire an attorney and the custodial parent has set onerous alternative conditions for visitation. *See In re Joseph D.N.*, M2009-01353-COA-R3-PT, 2010 WL 744415, at *4–5 (Tenn. Ct. App. Mar. 3, 2010). In that case, a custodial mother told the child's father that he could either have visitation at a fast food restaurant supervised by her new fiancé or could go to court to obtain an order of visitation. *Id.* at *4. The father could not afford to hire counsel and was forbidden from contacting the mother directly or indirectly as a condition of his release from jail. *Id.* at *5. On these facts, we held that a trial court erred in finding a willful failure to visit when "Father would have had to either accede to Mother's onerous conditions, violate a condition of bail, or institute a court proceeding he could not afford." *Id.*

While legal action can indicate a party's willfulness to pursue a relationship with a child, a half-hearted or abandoned effort to pursue legal action may not be sufficient to demonstrate a lack of willfulness. *See In re M.L.P.*, 281 S.W.3d at 393. In that case, a father pursued legal action to establish paternity, but failed to take additional steps to request custody or visitation after a new birth certificate was issued. *Id.* When testifying, the father admitted that he had no good reason to not make efforts to obtain visitation. *Id.*

Another case is informative on this issue. In *In re Gavin G.*, No. M2014-01657-COA-R3-PT, 2015 WL 3882841 (Tenn. Ct. App. June 23, 2015), the willfulness of a father's failure to visit was again at issue. In particular, the father argued that his failure to visit was not willful because he was living in a sober living facility during the relevant four months and "the facility's 'specific rules' limited [f]ather to on-site visits with family or occasional day passes to visit a specific location." *Id.* at *7. Additionally, the father claimed that the child's mother refused to allow the child to visit.

After reviewing the evidence, however, we rejected the father's argument. As we explained,

> Despite Mother's resistance to visitation at the facility or Grandmother's home, we conclude Father's failure to visit was willful. Father was aware of his obligation to visit Gavin. In fact, he petitioned to set visitation in August 2010. He also had the capacity to do so. Although he lived in the sober living facility, the proof showed Father was able to arrange visits and contact with individuals outside the facility. Father was also able to call, write, and visit Grandmother. He did not do the same for Gavin.
>
> Although the facility limited Father's options for visiting Gavin, we conclude Father had no justifiable excuse for his failure to visit Gavin. Father had the ability to request passes to visit others, and he was able to request visitation with Gavin through Mother or the court. Father did neither. Father claims Mother impeded his ability to visit Gavin. Although Mother limited the locations in which Father could visit Gavin, she did not significantly restrain or interfere with Father's ability to develop a relationship with Gavin. Even Father admits that he could have done more to arrange visitation with Gavin than make requests through Grandmother. Despite the parties' communication difficulties, Father had a legal obligation to visit his son, and he completely failed to do so during the relevant four-month period. *See In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *23 (Tenn. Ct. App. May 4, 2005) (finding that a mother had abandoned her children for willful failure to visit despite her attempts to arrange visitation through third parties before the relevant four-month period).
>
> Perhaps most telling, in May 2013, Father left the facility to personally file a motion to reduce his child support obligation. Yet, despite his alleged difficulties communicating with Mother, he did not file a motion requesting visitation with Gavin. Certainly, Father was under no requirement to seek court assistance to enforce his visitation rights. *See In re Joseph D.N.*, No. M2009-01353-COA-R3-PT, 2010 WL 744415, at *4 (Tenn. Ct. App. Mar. 3, 2010). However, taking legal action to enforce visitation rights can preclude a finding of willfulness. *In re M.L.P.*, No. W2007-01278-COA-R3-PT, 2008 WL 933086, at *11 (Tenn. Ct. App. Apr. 8, 2008); *see also In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (finding that the parents had not abandoned their child, despite their failure to visit, because they "actively pursued legal proceedings to regain custody."). If Father wanted to visit Gavin but was unreasonably being denied this opportunity, he could have filed a motion to enforce his right to visit. He chose to seek only a reduction in his support obligation instead.

- 10 -

*In re Gavin G.*, 2015 WL 3882841, at *7. Thus, while we held that the father "was under no requirement to seek court assistance" in enforcing visitation rights that had been previously ordered by the court, his decision to expend effort to lower his child support obligation without a concomitant effort to gain visitation showed that his failure to visit was indeed willful.

In another case, a parent who previously used the court system to "assert his parental rights" yet later admitted to have stopped trying to visit his daughter willfully failed to visit his child. *In re Kelsea L.*, No. E2019-00762-COA-R3-PT, 2020 WL 414556, at *4 (Tenn. Ct. App. Jan. 27, 2020). A parent was also found to not have actively pursued a relationship with a child through the court system when that parent did not attend court hearings. *See In re Erykah C.*, No. E2012-02278-COA-R3-PT, 2013 WL 1876011, at *6 (Tenn. Ct. App. May 6, 2013). Further, active pursuit of a parent-child relationship does not occur when that parent's petition for visitation stalled for two years in court. *See In re Adoption of Angela E.*, 402 S.W.3d 636, 642 (Tenn. 2013).

The facts in the present case defy easy categorization into either camp. Here, there can be no question that Mother impeded Father's ability to visit the child and that there was "antagonism" between the parties as a result of Father's ill-advised decision to take the child out of state without Mother's knowledge or consent. *In re Justin P.*, 2018 WL 2261187, at *6. Moreover, there is no genuine dispute that the understanding of the parties was that Father would need to seek court intervention to regain visitation. Yet, persuasive caselaw indicates that a parent is "under no requirement to seek court assistance" in enforcing previously ordered visitation rights. *In re Gavin G.*, 2015 WL 3882841, at *7 (citing *In re Joseph D.N.*, 2010 WL 744415, at *4). In this case, however, Father had never been granted any formal visitation rights with the child. *See generally* Tenn. Code Ann. § 36-2-303 ("Absent an order of custody to the contrary, custody of a child born out of wedlock is with the mother."). On the other hand, this court has found substantial interference in a child placing agency's position that a parent was required to litigate to develop a relationship with the child even when the parent had not yet been granted formal visitation rights. *In re S.M.*, 149 S.W.3d at 643.

It cannot be denied, however, that Father was not diligent in his efforts to gain visitation through court intervention, eventually abandoning those efforts. *See generally In re Adoption of Angela*, 402 S.W.3d at 642; *In re Kelsea*, 2020 WL 414556, at *4; *In re Erykah*, 2013 WL 1876011, at *6. However, Father testified that the reason he abandoned his Virginia petition was because he could not afford the required home study. Mother did not dispute this testimony, and nothing in the trial court's order indicates that it found Father to lack credibility as to this issue. Indeed, Father was appointed counsel to represent him in the trial court, indicating that the trial court found Father to be indigent even given his higher income at the time of these proceedings. Thus, it appears that a financial barrier prevented Father from pursuing visitation through the courts. A failure to act is not willful, however, when the parent lacks the ability to accomplish the act due to financial restraints,

- 11 -

other than those that are voluntary or self-imposed. *Cf. In re Adoption of Angela E.*, 402 S.W.3d at 640 (holding that to show willfulness, the parent must have "had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so").

There is no evidence that Father completely ignored his duty to visit the child, abandoning any visitation request while making efforts elsewhere. *See In re Gavin G.*, 2015 WL 3882841, at *7. (where father did not seek visitation but contacted other persons and filed a motion to decrease his child support). Indeed, Mother did not dispute that Father continued to call her at least four to five times over the years, always asking for visitation with the child. Mother, however, never wavered in her decision that Father would not be allowed to see the child in any location or manner absent a court order and even admitted to blocking Father's phone calls. The trial court recognized the steps Mother took in preventing Father's access to the child, but appears to have expected Father to take even greater action in the face of Mother's interference. For example, while the trial court admits that Mother blocked Father's phone number, the trial court found fault in Father's failure to use the phones of third-parties to contact Mother. This Court has held, however, that placing onerous burdens on a parent's ability to interact with his or her child can constitute significant interference. *See In re Joseph D.N.*, 2010 WL 744415, at *4–5 (holding that a mother significantly interfered with visitation when she placed onerous visitation conditions on the visits, forcing the father to either violate conditions of bail by contacting the mother or go to court to obtain visitation). Moreover, Mother admitted in her testimony that even if Father had used these means to contact her, she would not have permitted visitation without a court order.

This is not a case wherein a custodial parent alleged that she feared for her child's health or safety if visitation with the non-custodial parent was permitted. Here, Mother allowed Father access to the child until Father made a foolish decision. Following Father's mistake, Mother did more than fail to facilitate visitation between the child and Father. She refused to allow it, even with supervision, despite Father's continued requests. Here, Mother essentially uses her legal status as the sole custodian of the child both as shield, preventing her from acquiescing to Father's repeated requests for visitation in the absence of a court order, and as a sword, to demonstrate a ground for termination of Father's parental rights due to his lack of visitation. While Mother certainly had the right to insist upon formal visitation via court order, Tennessee law makes clear that a parent cannot significantly interfere with the noncustodial parent's visitation and still rely on the ground of failure to visit to terminate parental rights. *See In re S.M.*, 149 S.W.3d at 642 n.18.

Here, Father has the burden to show that his failure to visit was not willful by a preponderance of the evidence. Tenn. Code Ann. § 36-1-102(1)(I). "Proving an allegation by a preponderance of the evidence requires a litigant to convince the trier-of-fact that the allegation is more likely true than not true." *McEwen v. Tennessee Dep't of Safety*, 173 S.W.3d 815, 825 n.19 (Tenn. Ct. App. 2005) (citing *Austin v. City of Memphis*, 684 S.W.2d 624, 634–35 (Tenn. Ct. App. 1984)). The evidence shows that, more likely than

not, Mother both "block[ed] access to the child" and "vigorously resist[ed] [Father's] efforts to visit the child." ***In re S.M.***, 149 S.W.3d at 642 n.18. Mother therefore placed a significant restraint on Father's visitation. Moreover, we simply cannot conclude that Father failed to meet his burden to show a lack of willfulness when, in the face of Mother's significant interference, he made sustained efforts, sometimes vigorous, sometimes more lackluster, in an attempt to maintain a relationship with his child. In this case, no party escapes blame for Father's lack of relationship with this child. However, Mother consistently rebuffed Father's efforts to be any part of the child's life. As such, we reverse the trial court's finding of a ground for termination by abandonment for failure to visit.

## 2. Failure to Support

Additionally, Father challenges whether the trial court erred when finding a ground to establish termination through abandonment by failure to support a child. *See* Tenn. Code Ann. § 36-1-113(g)(1). For the purpose of terminating parental rights, abandonment can occur when parents or guardians "either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child" for a period of four consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). In particular, a failure to support can occur when a parent fails "for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). As with abandonment for failure to visit, a lack of willfulness can serve as an affirmative defense to the ground of failure to support. Tenn. Code Ann. § 36-1-102(1)(I). However, a parent "shall bear the burden of proof that the failure to visit or support was not willful" and must establish the lack of willfulness by a preponderance of evidence. ***Id.***

Efforts to frustrate or impede a parent's visitation do not justify a parent's failure to financially support a child. ***In re Audrey S.***, 182 S.W.3d at 864 (citations omitted). Parents who are at least eighteen years old are presumed to have knowledge of their legal obligation to financially support their children. Tenn. Code Ann. § 36-1-102(1)(H); *see also* ***In re Keri C.***, 384 S.W.3d 731, 746 (Tenn. Ct. App. 2010) (citing ***In Matter of M.L.P.***, 281 S.W.3d 387, 392 (Tenn. 2009) ("The Supreme Court has held that, in the context of termination proceedings initiated by a private party . . ., there need be no showing that the biological parent was aware of the consequences of her failure to visit or support her child, in order to show willfulness.")).

At trial, Father conceded that he failed to provide financial support to Braelyn in the four months prior to the filing of the petition and for several years before that. However, Father claimed that his failure to support was not willful, as he did not know Mother's mailing address to send support and because Father had no contact with Braelyn for an extended period. Father presented evidence of occasional payments and purchases he made for Braelyn until 2015 before his visits with his son were stopped. Father testified that he

offered to pay child support during his occasional conversations with Mother, but described that potential support as a "bribe" used in order to provide access to his son.

Previously, this Court has held that a parent's obligation to financially support a child is not excused when the parent does not know a custodial parent's mailing address or when a custodial parent refuses to provide access to the child. *In re Archer R.*, No. M2019-01353-COA-R3-PT, 2020 WL 820973, at *7 (Tenn. Ct. App. Feb. 19, 2020). The father in *In re Archer R.* testified that his lack of support was not willful because he did not know where to send the support, the custodial parent did not request support, and no court had ordered him to make payments. *Id.* This Court rejected the father's claims, holding that not knowing a mailing address to send payments is no excuse for not supporting a child. *Id.* If no address was known, the father "could have submitted child support payments to the Juvenile Court if he did not know where else to mail support payments." *Id.* When a parent did make the effort suggested in *In re Archer R.*, we have held that significant interference was shown. *See In re: Kiara S.*, No. E2015-00003-COA-R3-PT, 2015 WL 6549592, at *10 (Tenn. Ct. App. Oct. 29, 2015). In that case, the non-custodial parent did not know the right address to send support, but attempted to obtain the address from court records and sent child support to that address via certified mail. *Id.* In that instance, we held that the non-custodial parent's failure to provide support was not willful and that willful failure to support could not serve as a ground for termination. *Id.*

In the present case, Father contends that his failure to support was not willful because Mother thwarted him from visiting the child without obtaining a court order. Further, Father testified that he could not have failed to provide support because he did not know where Mother and Braelyn lived and could not send resources to them. Respectfully, we disagree. Any efforts from Mother to prevent Father from having visitation do not affect Father's obligation to provide child support. His duty to support is presumed by statute and exists whether visitation occurs or not. While Father asserts that he did not know the proper mailing address for Mother, that fact in itself does not establish that his failure to support was not willful. Father knew of an address where he believed Mother lived, yet he made no substantive efforts to confirm that address or send resources there. Further, Father had sent a gift to Braelyn to the address of Braelyn's maternal grandmother, but did not inquire whether that address was still valid. Instead, Father declined to provide support to his child as long as he could not obtain visitation. At trial, he characterized his offer to provide support to Mother as a "bribe" to ensure visitation with this son. That description does not align with Father's duty to provide support and in no way justifies his failure to do so. Father was not thwarted from paying child support by Mother's efforts to prevent visitation. Unlike visitation with the child, Father could have made efforts at support that were independent of both Mother's cooperation or court intervention; he chose not to make this effort, preferring to withhold support as a bribe to Mother. Support, however, is not for the benefit of the custodial parent but the child; just as Mother chose to deprive the child of a relationship with Father, Father chose to deprive the child of his financial support. The law in Tennessee does not support this action. Therefore, we affirm the trial court's

- 14 -

finding of a ground for termination for abandonment for failure to support.

### B.    Willingness and Ability

Father also contends that the trial court erred in finding that Father failed to manifest a willingness and ability, whether by act or omission, to personally assume legal and physical custody or financial responsibility of the child and that placing the child in his legal and physical custody would create a risk of substantial harm to the child's physical or psychological welfare. Tenn. Code Ann. § 36-1-113(g)(14). Essentially, the statutory ground has two distinct elements which must be proven by clear and convincing evidence:

> First, DCS must prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].' DCS must then prove that placing the children in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren].'

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*7 (Tenn. Ct. App. Apr. 4, 2018) (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

We note that the first prong of this ground for termination has sparked disagreement within this Court as to the proof required to satisfy it. *Compare **In re Ayden S.***, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at \*7 (Tenn. Ct. App. May 31, 2018) (holding that the petitioner must prove both an inability and unwillingness to assume custody or financial responsibility of a child), *with **In re Amynn K.***, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at \*12 (Tenn. Ct. App. June 20, 2018) (holding that the petitioner need only prove that "a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child.").

In *Ayden S.*, a panel of this court held that the ground specified in Tennessee Code Annotated section 36-1-113(g)(14) was not met when a parent professed a willingness, but had no ability to assume physical and legal custody of a child. 2018 WL 2447044, at \*7. As that panel stated:

> [T]he statute requires the party seeking termination to prove a negative: that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child.

> \*   \*   \*

In general, "statutory phrases separated by the word 'and' are usually to be

- 15 -

interpreted in the conjunctive." ***Stewart v. State***, 33 S.W.3d 785, 792 (Tenn. 2000). In the context of a "negative proof" connected by the word "and," a party "must prove that . . . all" of the listed items were not met. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 120 (2012).

At oral argument, DCS urged that we interpret the word "and" in the disjunctive so that it only had to prove an inability or unwillingness of the parents to assume custody of the children. Our supreme court has "recognized that the word 'and' can also be construed in the disjunctive where such a construction is necessary to further the intent of the legislature." ***Stewart v. State***, 33 S.W.3d at 792. But because "we generally presume that the General Assembly purposefully chooses the words used in statutory language," *id.*; *cf.* SCALIA & GARNER, *supra*, at 116 ("Under the conjunctive/disjunctive canon, and combines items while or creates alternatives."), and the presumption has not been rebutted, we decline to adopt DCS's interpretation here.

*Id.* That holding was followed by additional panels of this Court when similar circumstances arose. *See, e.g.,* ***In re Allyson P.***, No. E2019-01606-COA-R3-PT, 2020 WL 3317318, at *11 (Tenn. Ct. App. June 17, 2020) (reversing this ground when DCS failed to prove a failure to manifest willingness to assume custody); ***In re Isabella W.***, No. E2019-01346-COA-R3-PT, 2020 WL 2070392, at *12–13 (Tenn. Ct. App. Apr. 29, 2020) (holding that this standard applied when DCS failed to prove a failure to manifest either a willingness or ability to assume custody of a child); ***In re Zaylee W.***, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (holding that this standard applied when vacating a ground for a lack of findings of fact and conclusions of law).

In ***Amynn K.***, a separate panel of this court held that section 36-1-113(g)(14) could be proven when a petitioner established a failure to manifest either an ability or willingness to assume legal and physical custody or financial responsibility for a child. 2018 WL 3058280, at *14. In that case, the court conducted a word-by-word textual analysis of the statutory clause and held that a petitioner must prove that a parent failed to meet a conjunctive basic requirement – manifesting a willingness *and* ability to assume custody or financial responsibility for a child. *Id.* at *13 (citing SCALIA & GARNER, at 116). As both an ability and willingness were required to meet the standard, this panel held that a failure to manifest either a willingness or ability indicated a failure to meet the basic requirement of the statute. *Id.* As stated by that panel of the court:

We conclude that the petitioner, DCS in this instance, is required to prove the parent's failure (a negative) to satisfy a conjunctive basic requirement:

- 16 -

the parent must have "manifest[ed], by act or omission, an ability <u>and</u> willingness." (Emphasis added.) We note that to treat this statutory ground as a negative proof is to require DCS to prove a parent's <u>in</u>ability and <u>un</u>willingness rather than the parent's <u>failure to manifest an ability and willingness</u>. In a separate use of the disjunctive "or," the statute further provides that DCS may prove the parent's failure by demonstrating either that the parent failed "to manifest an ability and willingness to personally assume legal and physical custody . . . of the child" <u>or</u> failed "to manifest an ability and willingness to personally assume . . . financial responsibility of the child." *See* Tenn. Code Ann. § 36-1-113(g)(14).

*Id.* at \*13. This approach was endorsed by several additional panels of this court when addressing this ground. *See, e.g.,* **In re Eli H.**, No. E2019-01028-COA-R3-PT, 2020 WL 2300066, at \*10 (Tenn. Ct. App. May 8, 2020) (holding that this standard applied when a parent lacked both willingness and ability to assume custody); **In re H.S.**, No. M2019-00808-COA-R3-PT, 2020 WL 1428777, at \*11 (Tenn. Ct. App. Mar. 20, 2020) (holding that the ground was satisfied when a parent had the willingness, but not the ability, to assume custody of her child); **In re Jayda H.**, No. E2019-00855-COA-R3-PT, 2019 WL 6320503, at \*9 (Tenn. Ct. App. Nov. 25, 2019) ("[W]e do not view a parent's demonstration of 'willingness' as fatal to this ground when accompanied by a failure to manifest the requisite 'ability.'").

Often, panels of this Court have simply concluded that the facts met the requirements set out in either standard. *See, e.g.,* **In re Jaxx M.**, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at \*8–9 (Tenn. Ct. App. Apr. 17, 2019) (holding that a parent's actions and circumstances established the required proof under the more stringent standard); **In re Colton B.**, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at \*9–10 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019) (holding that choosing one approach was unnecessary when a parent manifested neither an ability nor a willingness to parent the child). The Tennessee Supreme Court recently granted permission for an appeal regarding the application of this termination ground and the split of authority surrounding it. *See* **In re Neveah M.**, M2019-00313-COA-R3-PT, 2020 WL 1042502 (Tenn. Ct. App. Mar. 4, 2020), *perm. app. granted*, No. M2019-00313-SC-R11-PT (Tenn. June 15, 2020).[4]

The facts of this case, however, do not permit us to avoid the dispute. Here, Mother failed to present clear and convincing evidence that Father was *unable* to either personally assume legal and physical custody of the child or financial responsibility of the child. The proof at trial did not show that Father's home or care was unsafe or that he was financially unable to pay appropriate support for a child. Thus, under any standard, Mother did not

---

[4] One judge on the panel concurred only in the results of the opinion.

present sufficient proof that Father failed to manifest an ability to personally assume legal and physical custody or financial responsibility of the child. Father's argument fails, however, as to *willingness*. While Father's actions have indicated that he indeed has manifested a willingness to assume custody of the child, there can be little dispute that Father has not manifested a willingness to assume financial responsibility for Braelyn. As discussed in detail *infra*, Father chose not to pay support for his child. Thus, regardless of whether he now states that he is willing to pay support, he certainly did not manifest this willingness through his actions prior to the filing of the termination petition. *See **In re Jonathan M.***, 2018 WL 5310750, at *5 (citing ***In re Keilyn O.***, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018)) ("When evaluating willingness, we look for more than mere words."). Under the ***Ayden S.*** standard, the fact that Father was able but unwilling to provide support proves fatal to this ground. In contrast, under the construction adopted in ***Amynn K.***, Father's failure to manifest the willingness to provide support for Braelyn is sufficient to meet the first prong of section 36-1-113(g)(14). Consequently, in order to determine if Mother proved a ground for termination, we must pick a side in this debate.

The ***Ayden S.*** and ***Amynn K.*** panels reached their conclusions by focusing first on the language of the statutes. Of course, the language used by a statute is the first and most important guidepost in interpreting a statute's meaning. In particular, we are directed "to carry out legislative intent without broadening or restricting the statute beyond its intended scope." ***Arias v. Duro Standard Products Co.***, 303 S.W.3d 256, 261 (Tenn. 2010) (citing ***Houghton v. Aramark Educ. Res., Inc.***, 90 S.W.3d 676, 678 (Tenn. 2002)). A statute should be analyzed naturally and reasonably while presuming "that the legislature says what it means and means what it says." ***In re Samaria S.***, 347 S.W.3d 188, 203 (Tenn. Ct. App. 2011) (citing ***BellSouth Telecomms., Inc. v. Greer***, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)). Further, we must apply the statute's plain meaning without complication and not interpret the statute to render any part of it as meaningless or superfluous. ***Id.*** (citing ***Estate of French v. Stratford House***, 333 S.W.3d 546, 554 (Tenn. 2011); ***Roy v. City of Harriman***, 279 S.W.3d 296, 302 (Tenn. Ct. App. 2008)).

As first blush, the use of the word "and" appears to support the ***Ayden S.*** approach.[5]

---

[5] Indeed, the undersigned joined in ***Ayden S.*** when it was filed. At the time, no opinions had yet to take issue with this interpretation of section 36-1-113(g)(14). In fact, the undersigned also took a similar approach with regard to a ground for termination applicable to putative fathers. *See **State, Dep't of Children's Services v. Williams***, No. W2008-02001-COA-R3-PT, 2009 WL 2226116, at *7 (Tenn. Ct. App. July 28, 2009) (reversing a finding on this ground when the record did not support that a putative father "had not expressed, through his words and actions, a willingness to parent a child."). A year later, however, the Tennessee Supreme Court appeared to come to the opposite conclusion. *See **In re Bernard T.***, 319 S.W.3d at 614–15 (holding that this ground was satisfied when a putative father manifested a willingness, but failed to manifest an ability to assume legal and physical custody of a child). *But cf. **In re Ashton B.***, No. W2015-01864-COA-R3-PT, 2016 WL 981320, at *9–13 (Tenn. Ct. App. Mar. 15, 2016) (questioning the wisdom of some of the reasoning in ***In re Bernard T.***); *see also* 2016 Tenn. Laws Pub. Ch. 636 (S.B. 2531) (amending the termination statutes to deal with issues created by the ***Bernard T.***

In general, "statutory phrases separated by the word 'and' are usually to be interpreted in the conjunctive." **Stewart**, 33 S.W.3d at 792. This rule is not applied inflexibly, however, and the word can be interpreted in the disjunctive "where such a construction is necessary to further the intent of the legislature." **Id.** Moreover, the **Amynn K.** interpretation does not rest on a conclusion that the use of "and" in section 36-1-113(g)(14) is disjunctive, but an interpretation that a petitioner can prove a failure to manifest two requirements, by proving that the parent failed to manifest one or the other. Consequently, if a parent is required to manifest two states of being, the petitioner succeeds by proving that one of the two necessary requirements has not been manifested.

The interpretation utilized by the **Amynn K.** court, however, continues to confound. In interpreting statutes, we must decipher intent "from the plain meaning of the statutory language, affording words of daily parlance their ordinary meaning without tortured construction." **Morristown Surgery Ctr., LLC v. Tennessee Health Facilities Comm'n**, No. M2002-02872-COA-R3-CV, 2003 WL 22955944, at *4 (Tenn. Ct. App. Dec. 15, 2003) (citing **Carson Creek Vacation Resorts, Inc. v. State Dept. of Revenue**, 865 S.W.2d 1, 2 (Tenn. 1993)). Respectfully, the construction of section 36-1-113(g)(14) borders on tortured. Although the interpretation technically does not alter the conjunctive nature of the plain language used, ultimately, the construction imposes an "either/or" requirement as to the petitioner's responsibility to show willingness and ability, fundamentally altering the conjunctive nature of the words used therein. If the General Assembly had intended such an interpretation, surely the plain language of the statute could have been drafted in a manner that more clearly expressed this intent. We generally presume that the General Assembly "purposefully chooses the words used in statutory language[.]" **Id.** (citing **Federal Express Corp. v. Tennessee State Bd. of Equalization**, 717 S.W.2d 873, 874 (Tenn. 1986)). That the General Assembly chose to use the word "and" rather than the equally available "either/or" language is therefore significant.

In addition, taking the **Amynn K.** interpretation to its logical conclusion leads to results that may be difficult to stomach. Indeed, under that standard, the first prong of the statute is met simply by showing that a parent is willing but unable to financially care for a child. Such an interpretation allows possible termination of the parent-child relationship based on financial hardship alone, without any consideration of the willfulness of that situation. Tennessee termination law, however, has generally reflected the notion that financial instability divorced from parental culpability is not sufficient to provide a ground for termination. *See e.g.,* Tenn. Code Ann. 36-1-102(a)(I) (making lack of willfulness an affirmative defense to failure to pay child support); **In re Adoption of Angela E.**, 402 S.W.3d 636, 641 (Tenn. 2013) (defining "willful" as having the capacity to pay support in the failure to pay child support context). Indeed, this Court has held that "mere poverty is

---

opinion). Obviously, more recent cases have called into question the reasoning applied in those earlier cases. Reconsideration of the approach at this juncture therefore appears wise.

neither ground nor arguable reason for the termination of a parent's rights." ***In re M.A.B.***, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *3 (Tenn. Ct. App. Aug. 20, 2007); *see also* ***In re DMD***, No. W2003-00987-COA-R3-PT, 2004 WL 1359046, at *5 (Tenn. Ct. App. June 17, 2004) ("[M]ere poverty is not grounds for termination of parental rights."). Rather, it has always been parent's choices that resulted in poverty that we found objectionable. ***In re M.A.B.***, 2007 WL 2353158, at *3 (citing the mother's "unwillingness to pursue" options to make a safe home for her children as the important facts for purposes of terminating parental rights); ***In re DMD***, No. W2003-00987-COA-R3-PT, 2004 WL 1359046, at *5 (citing the fact that the mother "made absolutely no attempt" to improve the situation). In fact, many states specifically consider economic hardship as a defense to a dependency and neglect action. *See* Michele Estrin Gilman, *The Poverty Defense*, 47 U. Rich. L. Rev. 495, 520 & n. 179–80 (2013) (noting that twenty-five states and the District of Columbia "consider economic hardship at some stage of dependency cases"). At least four states also statutorily provide that poverty is not a ground for termination of parental rights. *Id.* at 522 & n.187–88 (citing Ky. Rev. Stat. Ann. § 625.090 (providing a ground for termination when "the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child"); Minn. Stat. Ann. § 260C.301 (providing a ground for termination when "the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental, or emotional health and development, if the parent is physically and financially able"); N.C. Gen. Stat. Ann. § 7B-1111 ("No parental rights, however, shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty."); Neb. Rev. Stat. Ann. § 43-292 (providing a ground for termination when the "parents, being financially able, have willfully neglected to provide the juvenile with the necessary subsistence, education, or other care necessary for his or her health, morals, or welfare[]")).

Under the ***Amynn K.*** standard, however, poverty alone may provide a ground for termination of parental rights, so long as the petitioner also proves that "placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. 36-1-113(g)(14). This interpretation may indeed pass constitutional scrutiny even when the first prong may be met by merely showing a parent's poverty. *See* ***Davis-Kidd Booksellers, Inc. v. McWherter***, 866 S.W.2d 520, 529 (Tenn. 1993) ("In construing statutes, it is our duty to adopt a construction which will sustain a statute and avoid constitutional conflict if any reasonable construction exists that satisfies the requirements of the Constitution."); *cf.* ***Hawk v. Hawk***, 855 S.W.2d 573, 577 (Tenn. 1993) (holding that substantial harm to the child's welfare must be shown in order to justify a state's "infringement on the fundamental

right of parents to raise their children as they see fit"). Regardless, constitutional issues were not raised in this appeal and therefore must be avoided. *See **Henderson v. City of Chattanooga***, 133 S.W.3d 192, 215 (Tenn. Ct. App. 2003) ("[O]ur courts will not decide constitutional issues unless resolution is absolutely necessary for determination of the case and the rights of the parties."). And in any event, concerns that the statute punishes poverty are largely irrelevant in this case, as Father was financially able, but did not manifest his willingness, to financially support his child. Moreover, "courts must avoid inquiring into the reasonableness of the statute or substituting their own policy judgments for those of the legislature." ***BellSouth Telecommunications, Inc. v. Greer***, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997) (citing ***State v. Grosvenor***, 149 Tenn. 158, 167, 258 S.W. 140, 142 (Tenn. 1924)). As such, these concerns do not resolve the dispute between the divergent interpretations reached by this Court.

The ***Ayden S.*** approach, however, is not without its faults. For one, in requiring both inability and unwillingness to take financial responsibility for the child, this interpretation has significant overlap with the failure to support ground for termination. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) (discussed in detail, *supra*). Both grounds rest on the ability and willingness of a parent to pay support,[6] but the section 36-1-113(g)(14) ground places a higher burden by also requiring a showing of substantial harm. Applying this definition therefore undermines the worth of this ground for termination. We are directed, however, not to interpret a statute to render any part of it meaningless or superfluous. ***In re Samaria S.***, 347 S.W.3d at 203 (citing ***Roy***, 279 S.W.3d at 302). With regard to financial responsibility then, the failure to manifest an ability and willingness ground may be rendered largely superfluous by the ***Ayden S.*** interpretation.

In addition to the practical considerations engendered by application of either interpretation, it simply cannot be ignored that the two divergent interpretations of section 36-1-113(g)(14) have found considerable support among the learned members of this Court. This fundamental disagreement as to the meaning of the language of the statute raises the specter of ambiguity:

> A statute is ambiguous when "the parties derive different interpretations from the statutory language." ***[State v.] Howard***, 504 S.W.3d [260, 270 (Tenn. 2016)] (quoting ***Owens v. State***, 908 S.W.2d 923, 926 (Tenn. 1995)). However, "[t]his proposition does not mean that an ambiguity exists merely because the parties proffer different interpretations of a statute. A party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute." ***Powers v. State***, 343 S.W.3d 36, 50 n.20 (Tenn. 2011). In other words, both interpretations must be reasonable in order for an ambiguity to exist. ***Id.*** If an ambiguity exists, however, "we may reference the broader statutory scheme, the history of the legislation, or other

---

[6] Willfulness being an affirmative defense to a failure to support. Tenn. Code Ann. § 36-1-102(1)(I).

sources" to determine the statute's meaning. ***State v. Sherman***, 266 S.W.3d 395, 401 (Tenn. 2008) (citing ***Parks v. Tenn. Mun. League Risk Mgmt. Pool***, 974 S.W.2d 677, 679 (Tenn. 1998)).

***State v. Frazier***, 558 S.W.3d 145, 152–53 (Tenn. 2018). Simply put, a statute is ambiguous when it is "fairly susceptible to two or more interpretations[.]" ***Atl. Coast Line R. Co. v. Richardson***, 121 Tenn. 448, 117 S.W. 496, 499 (Tenn. 1908); *see also* ***In re Estate of Elrod***, No. E2014-02205-COA-R3-CV, 2015 WL 5304624, at *6 (Tenn. Ct. App. Sept. 10, 2015) (holding that language "is ambiguous, as it is susceptible to more than one meaning to a reasonably prudent person as evidenced by the varying definitions among dictionaries, New York statutes, and Tennessee statutes.").

Although certainly not dispositive, other courts have concluded that statutes were ambiguous when they were subject to differing, reasonable interpretations by different courts or judges. For example, in considering the proper interpretation of language related to worker's compensation benefits, the United States Court of Appeals for the Tenth Circuit opined that "[t]he split in the circuits is, in itself, evidence of the ambiguity of the [subject language]; its meaning is not evident based on the plain language of the statute." ***In re S. Star Foods, Inc.***, 144 F.3d 712, 715 (10th Cir. 1998); *But see* ***In re Integrated Health Servs., Inc.***, 291 B.R. 611, 613 (Bankr. D. Del. 2003) (holding that the same language was not ambiguous). Thus,

> [a]lthough a split amongst courts as to the appropriate meaning of a statute does not automatically equate to an ambiguity in the language of the statute, divided opinions amongst a wide variety of courts is certainly evidence that reasonable minds can differ as to the meaning of the language, and that the statute at issue is not entirely clear.

***Noall v. Howard Hanna Co.***, 750 F. Supp. 2d 833, 836 (N.D. Ohio 2010) (citing ***Carter v. Welles–Bowen Realty, Inc.***, 553 F.3d 979, 986 (6th Cir. 2009) (considering outside sources to determine the meaning of a statute, in part, "[b]ecause of the varying views of other courts reviewing these provisions"); *see also* ***McCreary v. Offner***, 172 F.3d 76, 82-83 (D.C. Cir. 1999) ("Although all four circuits found the statutes sufficiently clear to preclude Chevron deference, they were not unanimous about the meaning of the supposedly unambiguous scheme . . . . The plausibility of these competing interpretations simply confirms our view that the [statute] is ambiguous."); *cf.* ***de Osorio v. Mayorkas***, 695 F.3d 1003, 1016 n.1 (9th Cir. 2012) (Smith, J., dissenting) ("I do not state or imply that a circuit split is evidence that a statute is ambiguous . . . . I merely point out the common sense proposition that if the intent of Congress were truly clear, it would be surprising that so many courts misread the statute.").

Here, different panels of this Court have examined the language of section 36-1-113(g)(14) and reached fundamentally inconsistent interpretations as to the proof required.

While each interpretation has both strong and weak points, neither interpretation is unreasonable given the plain language of the statute. *See Powers v. State*, 343 S.W.3d 36, 50 n.20 (Tenn. 2011) (holding that an ambiguity is not created "by presenting a nonsensical or clearly erroneous interpretation of a statute"). Consequently, the statute is clearly subject to more than one legitimate interpretation. *See State ex rel. Gibbons v. Jackson*, 16 S.W.3d 797, 800 (Tenn. Ct. App. 1999) (holding that a statute is ambiguous when "the parties legitimately derive different interpretations"). Under these circumstances, the only reasonable conclusion is that the statute is ambiguous.

The ambiguity in the statute obliges us to consider additional information in determining its meaning. Indeed, "where the statute is ambiguous, . . . the intended meaning of the act must be sought by the aid of all pertinent and admissible considerations." *Richardson*, 117 S.W. 496 at 499 (internal citation and quotation marks omitted). In practice, this means that we consider the entire statutory scheme and other reliable guides to ascertain the legislature's intent and purpose in enacting the statute. *Powers*, 343 S.W.3d at 50. "Some 'reliable guides' include the statute's historical background, the conditions giving rise to the statute, circumstances contemporaneous with the statute's enactment, and the statute's legislative history." *Robinson v. Fulliton*, 140 S.W.3d 312, 321 (Tenn. Ct. App. 2003) (citing *BellSouth Telecommunications, Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997).

As previously discussed, the purpose of the termination statutes is to provide a basis for the State to exercise its "special duty to protect minors" while protecting the fundamental right of parents to the care and custody of their children. *In re Carrington H.*, 483 S.W.3d at 522–23. Thus, while the State has an interest to protect children from harm, this interest must be balanced against the parent's fundamental right. *Id.* Because of the fundamental parental right, we generally narrowly construe statutes that allow for interference in the parent-child relationship. *See In re Diawn B.*, No. M2017-01159-COA-R3-JV, 2018 WL 3530838, at *5 (Tenn. Ct. App. July 23, 2018) (citing *Spears v. Weatherall*, 385 S.W.3d 547, 550 (Tenn. Ct. App. 2012) (holding that a statute involving grandparent visitation should be narrowly construed)). In other states, courts have held that this means that "[s]tatutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. 2004); *Matter of J.A.C.*, 911 P.2d 825, 829 (Kan. Ct. App. 1996) ("Statutes pertaining to adoption, relinquishment, or termination of parental rights are strictly construed as they all affect a parent's liberty interest in the custody and control of his or her children."). Construing this statute strictly in favor of the parent supports adoption of the *Ayden S.* construction of section 36-1-113(g)(14), as this interpretation imposes a higher evidentiary burden to establish a ground for termination.

In some ways, however, a holding that the ambiguity in the statute should be construed in favor of the parent resembles the rule of lenity applicable in criminal proceedings. According to the United States Supreme Court, criminal statutes are to

likewise be strictly construed, "and any ambiguity must be resolved in favor of lenity." *United States v. Enmons*, 410 U.S. 396, 411, 93 S. Ct. 1007, 1015, 35 L. Ed. 2d 379 (1973). Thus, the rule of lenity "requires that an ambiguous criminal statute be resolved in favor of the defendant[.]" *State v. Lawson*, No. E2018-01566-CCA-R3-CD, 2019 WL 4955180, at *7 (Tenn. Crim. App. Oct. 8, 2019), *perm. app. denied* (Tenn. Mar. 25, 2020). The rule, however, "is a 'tie-breaker' to be used only when an ambiguity remains after considering the plain language of the statute, the legislative history, and other canons of statutory construction." *Id.* (citing *State v. Marshall*, 319 S.W.3d 558, 563 (Tenn. 2010) (internal citations omitted)). By analogy then, even if we were to apply a similar rule to resolve ambiguities in favor of the parent, we could not do so without first consulting, among other sources, the legislative history of the enactment.

The ground contained in section 36-1-113 is a relatively recent addition to the termination statute. It was enacted in 2016 as part of a bill focused on amending title 36 relative to adoption. *See* 2016 Tenn. Laws Pub. Ch. 919 (S.B. 1393), *approved* (April 27, 2016), *effective* (July 1, 2016). According to one of its sponsors, Senator Jeff Yarbro, the bill was intended to bring clarity to Tennessee adoption law in order to facilitate adoptions. Representatives from the Tennessee Administrative Office of the Courts, the Tennessee Department of Children's Services, private adoption agencies, and adoption attorneys were integral to the drafting of the bill. After thoroughly reviewing the legislative hearings concerning this enactment certain testimony is enlightening. Specifically, at a March 29, 2016 House Civil Justice Committee hearing, Representative Mark Windle asked that attorney Lisa Collins be allowed to testify as to "the legislative intent" of the bill. Lisa Collins, a Nashville adoption attorney, testified that she was requested by the Administrative Office of the Courts to proffer some information concerning the legislative history of the bill. With regard to what came to be section 36-1-113(g)(14), Ms. Collins testified that the purpose of this section was to provide a ground for termination when the following circumstances are shown: "long term *either* inability or unwillingness to provide for a child that is biologically . . . *or* legally yours, . . . and such conduct leads to harm to a child." (Emphasis added). Following Ms. Collins' testimony, the bill was passed through the committee unanimously. Despite a thorough review of other hearings in which this legislation was discussed, Ms. Collins' proffered legislative intent was neither questioned nor contradicted.

The legislative history concerning the enactment of section 36-1-113(g)(h) is highly relevant. Not only did Ms. Collins testify as to the exact dispute at issue in this case, her testimony was expressly described as for the purpose of establishing the legislative intent. Thus, although the language ultimately used in section 36-1-113(g)(14) "lack[ed] precision," *Thompson*, 38 S.W.3d at 512, its meaning can be readily derived from a review of the enactment's legislative history. And that legislative history clearly shows that the intent of the statute was to provide a ground for termination if the petitioner proves "either inability or unwillingness" under section 36-1-113(g)(14). Any ambiguity in the statute is therefore resolved by the legislative history in favor of the interpretation furthered by

- 24 -

***Amynn K.*** and its progeny. As discussed *supra*, Father manifested the ability, but not the willingness, to assume financial responsibility for Braelyn. Applying the ***Amynn K.*** interpretation of section 36-1-113(g)(14), we therefore affirm the trial court's finding that the first prong of section 36-1-113(g)(14) was proven by clear and convincing evidence in this case.

We therefore proceed to consider whether Mother presented clear and convincing evidence sufficient to satisfy the second prong of the statute—that placing the child in his legal and physical custody would create a risk of substantial harm to the child's physical or psychological welfare. Tenn. Code Ann. 36-1-113(g)(14). With regard to substantial harm, this Court stated that:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

***In re Maya R.***, 2018 WL 1629930, at *7 (quoting ***Ray v. Ray***, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted)).

In determining that sufficient evidence existed as to this ground, the trial court found that placing Braelyn in Father's care would create a risk of substantial physical or psychological harm for the child. The trial court concluded that the risk of harm existed based on the lack of a relationship between Father and Braelyn, the failure to support or assume legal responsibility for the child, and the lack of custodial time that Father had with Braelyn. After a thorough review of the record, we agree. Here, Father conceded that reintroducing himself to Braelyn after more than five years apart would be difficult for the child. Braelyn has bonded and thrived in his current family situation. Although both parties are partially to blame for the situation, there can be no dispute that Father is a virtual stranger to the child. Other cases have held in similar situations that forcing the child to begin visitation with a near-stranger would make psychological harm sufficiently probable. *See **In re Antonio J.***, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (holding that substantial harm could be established when a child was removed from a home when very young and had nightmares out of fear of being removed from his foster family); ***State v. C.H.H.***, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002) (holding that removal from the child's current family and placement with a near-stranger could constitute substantial harm). As Father recognizes the potential problems that could occur with a reintroduction to his son, we conclude that such interactions would create a substantial risk of harm for the child.

As discussed *supra*, Father manifested the ability, but not the willingness, to assume financial responsibility for Braelyn. In addition, a risk of substantial harm would exist if Braelyn was placed in Father's custody. Applying the ***Amynn K.*** interpretation of section 36-1-113(g)(14), we therefore affirm the trial court's finding that this ground was proven by clear and convincing evidence.

## II. Best Interests

Because at least one ground for terminating parental rights is supported by clear and convincing evidence, we now consider whether the trial court erred in finding that termination of Father's parental rights was in the best interest of the child. After a ground of termination is established, "the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." ***In re Audrey S.***, 182 S.W.3d at 877. The best interests of the child may not always lead to termination, even if a parent is deemed unfit by a court. ***Id.***

To determine whether termination of parental rights is in a child's best interest's the court shall consider, but is not limited to, the following factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively

providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). Further, our Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681–82 (Tenn. 2017) (internal citations omitted). Determining the best interests of a child does not simply involve examining statutory factors or counting how many factors support or oppose a potential termination. *Id.* at 682. Each analysis must remain "factually intensive", and consideration of the factors should be rooted in each case's unique facts and circumstances. *Id.*

In the present case, an analysis of the combined weight of these factors establishes clear and convincing evidence that termination of Father's parental rights is in the best interests of the child. In our view, the lack of a meaningful relationship provides the greatest insight regarding the best interests of the child. *See In re Addalyne S.*, 556 S.W.3d 774, 795 (Tenn. Ct. App. 2018) ("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor. . ."); *In re Terry S.C.*, No. M2013-02381-COA-R3-PT, 2014 WL 3808911, at *18 (Tenn. Ct. App. July 31, 2014) ("[P]erhaps most importantly, [the mother] has failed to maintain regular visitation with the children and therefore has no meaningful relationship with them"). During his testimony, Father conceded that he has no meaningful relationship with his son and that a reintroduction into his son's life would be "hard" on the child initially. In his brief, Father now contends that Braelyn's relatively young age would allow sufficient time for the child to adapt to new circumstances and build a meaningful relationship with his Father. However, the potential of any future relationship does not negate the absence of a meaningful relationship in the present. At this time, Braelyn has not seen Father for more than five years and calls Step-Father "Daddy." We concede that Mother's decision to thwart Father's visitation is partly to blame for Father's lack of relationship, meaningful or otherwise, with the child. However, Father took no action to

reintroduce himself to the child, even after he learned of Mother's desire to terminate his parental rights ten months before the initial petition to terminate was filed. Indeed, once the termination petition was filed and Father was appointed counsel, he still did not file any motion asking for visitation with the child. Thus, Father shares the responsibility for the lack of relationship between himself and the child. This factor therefore heavily favors termination.

Additionally, Father conceded at trial that returning to Braelyn's life in any form would be "hard" on his son at first. *See* Tenn. Code Ann. § 36-1-113(i)(5) (involving the effect of change in caretakers or physical environment on the child). While Father admitted to the difficulty that his son might have while re-establishing his relationship with Father, he stated that such a reunion "needs to be done." On appeal, Father contends that no change in caretakers would occur and that Braelyn, a 7-year-old, would adapt to Father's potential presence in his life in time. Mother claims that such a reunion, particularly if it occurred in Georgia, could "traumatize" Braelyn.

Previously, courts have affirmed a trial court's finding that a change of caretakers and physical environment would support parental termination when a parent without a meaningful relationship attempted to establish a new relationship with the child. *In re F.R.R., III*, 193 S.W.3d 528, 531 (Tenn. 2006); *see also In re Aubrie W.*, No. E2019-00862-COA-R3-PT, 2020 WL 360504 (Tenn. Ct. App. Jan. 21, 2020) (holding that a change in caretakers would be detrimental to a child's emotional condition when the child bonded with her stepfather and does not know that her stepfather is not her biological parent); *Matter of Ian B.*, No. M2016-02504-COA-R3-PT, 2017 WL 4051096, at *10 (Tenn. Ct. App. Sept. 13, 2017) (holding that this factor weighed in favor of termination when children were well-adjusted to their living arrangement and had no contact with non-custodial parent). However, this Court has previously avoided consideration of this factor when one parent had full custody of children, the other parent was not seeking custody, and a denial of the petition for termination would not lead to a change of caretakers or physical environment. *In re Johnathan M.*, 591 S.W.3d 546, 562 (Tenn. Ct. App. 2019); *In re C.E.P.*, No. E2003-02410-COA-R3-PT, 2004 WL 2191040, at *5–6 (Tenn. Ct. App. Sept. 29, 2004). Nevertheless, we recognize that the present case provides more factual parallels with cases where this factor is considered. *See In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)) (describing the best interests analysis as a "fact-intensive inquiry" requiring courts to weigh evidence regarding all relevant factors).

Here, Father has never possessed custodial or visitation rights with the child and has not interacted with the child for years by the time of the termination trial. Further, the child is well-adjusted to his current living arrangements and uses the term "Daddy" to describe Step-Father. Father even conceded during testimony that such a transition would be "hard" on his son. Thus, if termination were denied and even simply visitation with Father ordered, a temporary change in caretakers would occur that would place the child in the custody of

- 28 -

someone currently seen as a stranger and would likely cause emotional and psychological harm to him. While Father believes that the child could adjust to those circumstances, the simple fact is that the child would admittedly be harmed by such a transition. Finally, Father's current contention that he would never seek to be the custodian of the child is undermined by his own decision to terminate mediation based on Mother's very reasonable position that she be named the primary residential parent of the child. Therefore, the trial court's finding that this factor supports termination of Father's rights is supported by a preponderance of the evidence and affirmed upon review.

In addition, Father's failure to provide child support consistent with the state's child support guidelines also provides support that termination is in the child's best interests. Tenn. Code Ann. § 36-1-113(i)(5). Since Father ceased having regular contact with the child after 2015, he claimed he was prevented from providing child support because he could not see the child and did not know where to send resources. As described *supra*, a lack of contact with a child or knowledge about a proper mailing address does not absolve a parent from disregarding his or her duty to support a child. Because Father failed to provide support to his son, the trial court correctly found that this lack of support favored termination as to the best interests of the child.

While several factors used by the trial court in its best interest analysis were supported by the record, two other factors were not properly grounded by a preponderance of the evidence. First the trial court found that Father "failed to make an adjustment of circumstances, conduct, and conditions to make it safe and in the child's best interest to be in the [his] home." *See* Tenn. Code Ann. § 36-1-113(i)(1). Respectfully, the evidence presented at trial does not establish that any adjustments to Father's circumstances were necessary to make it safe and in Braelyn's best interests to be in Father's home. The record indicates Father and his fiancée live with their two children in a Georgia townhome and provide a stable living environment for their children there. While Father's circumstances may not have changed, Mother presented no proof that a change was necessary. As the evidence for this ground was not established, this ground may be neutral or slightly support Father.

In addition, Father's failure to maintain regular visitation or contact with the child is not tied solely to his own actions. *See* Tenn. Code Ann. § 36-1-113(i)(3). As shown *supra*, Mother thwarted Father's efforts to see his child and made it clear that visitation would not be allowed unless ordered by a court. Because of this, a preponderance of the evidence did not support that a failure to visit the child supported termination. Of course, even when Father had the opportunity to request visitation through his appointed counsel in this litigation, he did not do so. Accordingly, although this factor does not favor termination, we must conclude that it carries little weight.

The trial court found several factors to be "not applicable to this matter", which were: whether a lasting adjustment occurred after reasonable efforts from social services

agencies; whether Father or anyone in his home was abusive; whether the physical environment of Father's home was safe, healthy, and free of any substances that could render Father unable to provide safe and stable care; and whether Father's mental or emotional state would detrimentally affect the child or prevent safe and stable care or supervision. We agree that factors related to social services are inapplicable in this case. *See* Tenn. Code Ann. § 36-1-113(i)(2). As to the other factors, however, we must conclude that the evidence preponderates against the trial court's finding that they are inapplicable.

Here, Mother did not present evidence that Father or anyone in his home was abusive; whether the physical environment of Father's home was safe, healthy, and free of any substances that could render Father unable to provide safe and stable care; and whether Father's mental or emotional state would detrimentally affect the child or prevent safe and stable care or supervision. *See* Tenn. Code Ann. § 36-1-113(i)(6)–(8). In the absence of evidence that tied Father to abuse, an unsafe home, or an unstable mental or emotional state, we must conclude that these factors weigh against termination. *See, e.g., **In re London B.**,* No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *12 (Tenn. Ct. App. Apr. 14, 2020) (holding that certain factors weighed against termination because no evidence was presented to show that the parent was guilty of abuse or detrimental psychological issues).

Based on the foregoing, it appears that three factors weigh in favor of termination, while five factors weigh against terminating Father's parental rights. As we have previously explained, however,

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (citing ***White v. Moody***, 171 S.W.3d at 194). Although more factors technically favor Father, they carry little weight in this case. To be sure, Mother stymied Father's relationship with the child, but when Father had opportunities to make progress in his desire to forge a relationship with the child, he failed to follow through. For example, Father chose to end mediation when Mother made reasonable offers concerning visitation. Or later, when Father had the opportunity to seek visitation following the filing of the termination petition, he made no request for visitation to resume. As a result, he has no meaningful relationship with the child and admits that it would be harmful for the child to be forced to interact with him. As previously discussed, when the parent and the child are essentially strangers, the lack of meaningful relationship

- 30 -

between the parent and child carries considerable weight in favor of termination. *See **In re Addalyne S.***, 556 S.W.3d at 795; ***In re Terry S.C.***, 2014 WL 3808911, at *18.

In contrast, the child is now part of a loving and stable family with a parent that is the only father he has ever known. And while Father should get credit for not engaging in criminal behavior or substance abuse, *see* Tenn. Code Ann. § 36-1-113(i)(7), the lack of evidence regarding these features in Father's home does not automatically mean that it is in the best interest of the child to further the parent-child relationship. Indeed, "the focus of the best interest analysis is not to punish a parent for his or her historically bad behavior" or to reward a parent for his or her good behavior; "instead, the focus must center on what is best for the child[] at present and in the future." ***In re Gabriella D.***, No. E2016-00139-COA-R3-PT, 2016 WL 6997816, at *22 (Tenn. Ct. App. Nov. 30, 2016) (Stafford, J., dissenting), *rev'd* 531 S.W.3d 662 (Tenn. 2017). Here, Father's failure to be in the child's life, either through visitation or, even more minimally, financial support, coupled with his admission that reintegration would harm the child, indicate that the child's best interests are not served by continuing the parent-child relationship. Thus, we must affirm the trial court's overall conclusion that Mother presented clear and convincing evidence that termination was in the child's best interest.

## CONCLUSION

The judgment of the Sullivan County Chancery Court is affirmed in part and reversed in part. The termination of Michel S.'s parental rights is affirmed. Costs of this appeal are taxed to Appellant Michel S., for all of which execution may issue if necessary.


s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE